



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| MICHAEL LEE ANDREWS TRUST, | § | |
| JAMES W. AND BONNALEE ASBURY | § | |
| FAMILY TRUST, BILL AND BETTY | § | |
| BARBEE FAMILY TRUST, BILL H. | § | **3 - 9 9 C V 1 2 4 2 - T** |
| BARBEE, HELEN C. BARBEE, B. | § | |
| HULL BARBEE, PENNY MARIS, | § | **CIVIL ACTION NO. _____** |
| INDIVIDUALLY, AND AS NEXT | § | |
| FRIEND OF ASHLEY BRACKEN, | § | |
| A MINOR, WENDY BRACKEN, F. E. | § | |
| BROWN, JR., ALISON BLAIR | § | |
| COLLIER A/K/A ALISON COLLIER | § | |
| ORREN, INDIVIDUALLY AND AS | § | |
| TRUSTEES OF THE JOEL A. PATRICK | § | |
| GP TRUST AND CLARK COLLIER | § | |
| ORREN 1993 TRUST AND THE | § | |
| JOEL PATRICK COLLIER, | § | |
| JR. 1993 TRUST, | § | **JURY TRIAL DEMANDED** |
| KAREN WILLIAMS COLLIER | § | |
| AS TRUSTEE OF THE CLARK | § | |
| COLLIER ORREN GP TRUST, | § | |
| BOBBY F. COLLIER, | § | |
| MIKE J. COLLIER, INDIVIDUALLY, | § | |
| AND AS NEXT FRIEND OF CURTIS | § | |
| COLLIER, A MINOR, MICHAEL | § | |
| COLLIER, JR., PAT COLLIER, | § | |
| CLIFFORD E. CUMBIE, | § | |
| CHRISTI N. DAVENPORT, | § | |
| HEATHER DAVENPORT A/K/A | § | |
| HEATHER KIMBERLY RUFFIN | § | |
| DAVENPORT A/K/A HEATHER K. | § | |
| RUFFIN, JOYCE DAVENPORT, | § | |
| MELANIE DAVENPORT, TRAVIS | § | |
| DAVENPORT, TYRONE DAVENPORT, | § | |
| DAVENPORT ENTERPRISES, | § | |
| BILLIE J. EMBREY, GARY | § | |
| EMBREY, ROBERT D. EMBREY, | § | |
| DR. JAY T. GORDON, JOOST | § | |
| GOSSCHALK, JONAS A. | § | |
| GOSSCHALK, CARROLL V. GUICE, | § | |
| JAMES M. AND PENELOPE HILL, | § | |
| HOYL OIL & MINERAL, INC., | § | |

WILLIAM H. HUDSPETH, O. L.    §
KIMBROUGH, JERRY LANDERS,    §
MICHAEL C. AND KAREN C.    §
LANDERS, TOM AND DOROTHY    §
LANDERS, TOM AND DOROTHY    §
LANDERS FAMILY TRUST,    §
TOM W. LANDERS, TOM W. AND    §
JOAN S. LANDERS III,    §
ORVAL T. LINDSEY, WILLIAM B.    §
LINDSEY, DR. EDWARD MACK,    §
INDIVIDUALLY AND AS TRUSTEE    §
FOR ADAM TAYLOR MACK, ALICIA    §
MACK, SARA ELIZABETH MACK    §
AND KELLY MACK AND D/B/A,    §
MACK ADVENTURE, LTD., W. M.    §
MATTHEWS, JR., ROGER MOSER,    §
SR., H. A. ORGAIN,    §
HELEN PHILLIPS, REM TEX,    §
INC., MICHAEL SANDERS,    §
SHILOH CHRISTIAN FELLOWSHIP    §
CHURCH, ESTELLE SMITH AND    §
BERNARD TAYLOR,    §
    §
    PLAINTIFFS,    §
    §
IRVING D. BOYES, SHIRLEY A.    §
SALKELD, MICHAEL J. LIVELY,    §
DONALD R. IGLEHART, STEPHEN K.    §
MOREHEAD, GREGORY N.    §
BOYES, J. MARC HESSE, AND    §
TUDOR EASTUP & CO., P.C.,    §
    §
    §
    DEFENDANTS.    §

## COMPLAINT

Plaintiffs file this Complaint against Irving D. Boyes, Shirley A. Salkeld, Michael J. Lively, Donald R. Iglehart, Stephen K. Morehead, Gregory N. Boyes, J. Marc Hesse, and Tudor Eastup & Co., P.C. as follows:

## I.

## PARTIES

A.    Plaintiffs

1.    Michael Lee Andrews Trust is a trust established in 1991 by Dr. Michael Lee Andrews, a veterinarian working in Terrell, Texas, and residing in Sunnyvale, Dallas County, Texas.

2.    James W. and Bonnalee Asbury Family Trust is a trust established on February 23, 1995, by James W. and Bonnalee Asbury, both 71 years of age, and who reside in Longview, Gregg County, Texas.  James W. and Bonnalee Asbury are the Trustees of the Asbury Family Trust.

3.    Bill H. and Betty Barbee Family Trust is a trust established in 1992 by Bill H. and Betty Barbee.  Betty Barbee died in 1993 and Bill H. Barbee is the remaining and sole Trustee of the Barbee Family Trust and resides in Sterling City, Sterling County, Texas.

4.    Bill H. Barbee is a 72 year old man residing in Sterling City, Sterling County, Texas.

5.    Helen C. Barbee is an 80 year old woman residing in Paris, Lamar County, Texas.  She is Bill H. Barbee's sister.

6.    B. Hull Barbee is a businessman in Kilgore, Texas. He resides in Henderson, Rusk County, Texas. He is Bill H. Barbee's son.

7.    Penny Maris is a 49 year old woman residing with her mother, Joyce Davenport, in Rockwall, Rockwall County, Texas. She is the mother of Ashley and Wendy Bracken.

8.    Ashley Bracken is a 14 year old minor child. Her mother is Penny Maris and as Next Friend brings this suit on Ashley Bracken's behalf. Said minor resides with her mother and her grandmother Joyce Davenport in Rockwall, Rockwall County, Texas.

9.    Wendy Bracken is a 19 year old woman. Her mother is Penny Maris and her grandmother is Joyce Davenport and she resides with both of them in Rockwall, Rockwall County, Texas.

10.    F. E. Brown, Jr. is a 69 year old man residing in Kilgore, Texas. Prior to his retirement, Mr. Brown was in the oil field equipment business.

11.    Alison Blair Collier a/k/a Alison Collier Orren is a 33 year old woman residing in Tyler, Smith County, Texas. She is Joe A. and Sylvia A. Collier's daughter and the mother of Clark Collier Orren. She is also the Trustee of the Joel Patrick Collier, Jr. GP Trust.

12.    Joel Patrick Collier, Jr. GP Trust is a trust established in November, 1993 by Joe A. and Sylvia A. Collier for their grandson, Joel Patrick Collier, Jr. Alison Blair Orren is the Trustee of the trust. She resides in Tyler, Smith County, Texas.

13.    Clark Collier Orren 1993 Trust is a trust established in November 1993 by Jon Milton Orren and Alison Blair Collier Orren for their son, Clark Collier Orren. Joe A. Collier and Sylvia A. Collier are the Trustees of the Trust and reside in Longview, Gregg County, Texas.

14. Joel Patrick Collier, Jr. 1993 Trust is a trust established in November, 1993 by Joel Patrick Collier and wife, Karen Williams Collier for their son, Joel Patrick Collier, Jr. Joe A. Collier and Sylvia A. Collier are the Trustees of the trust and reside in Longview, Gregg County, Texas.

15. Clark Collier Orren is the 5 year old son of Alison Blair Collier Orren and is the grandson of Joe A. and Sylvia A. Collier. He resides with his parents in Tyler, Smith County, Texas.

16. Joel Patrick Collier, Jr. is the 5 year-old grandson of Joe A. and Sylvia A. Collier. He resides with his parents in Houston, Harris County, Texas.

17. Clark Collier Orren GP Trust is a trust established in 1993 by Joe and Sylvia Collier for their grandson, Clark Collier Orren. Karen Williams Collier is the Trustee of the trust and resides in Houston, Harris County, Texas.

18. Bobby F. Collier is a 69 year old furniture store owner working and residing in Longview, Gregg County, Texas. He is the brother of Mike J. Collier, Joe A. Collier and Pat S. Collier.

19. Mike J. Collier is a 52 year old furniture store owner living and residing in Longview, Gregg County, Texas. He is the brother of Joe A. Collier, Bobby F. Collier and Pat S. Collier and is the father of Michael J. Collier, Jr. and the minor child Curtis Collier.

20. Curtis Collier is 17 year old minor child. His father is Mike J. Collier and as Next Friend brings this suit on Curtis Collier's behalf. Curtis Collier resides with his father in Longview, Gregg County, Texas.

21. Michael J. Collier, Jr. , is a 21 year old student residing in Waco, McLennan County, Texas. He is the son of Mike J. Collier.

22.     Pat Collier is a 67 year old furniture store owner living and residing in Longview, Gregg County, Texas.  He is the brother of Mike J. Collier, Joe A. Collier and Bobby F. Collier.

23.     Clifford E. Cumbie is a 47 year old salesman working and residing in Dallas, Dallas County, Texas.

24.     Christi N. Davenport is the 19 year old daughter of Tyrone Davenport and the grandchild of Joyce Davenport.  She resides with her husband in Royce City, Texas.

25.     Heather Davenport a/k/a Heather Kimberly Ruffin Davenport is a 27 year old schoolteacher.  She is the daughter of Tyrone Davenport and the grandchild of Joyce Davenport.  She resides with her husband in Rockwall, Rockwall County, Texas.

26.     Joyce Davenport is a widow, age 72, who resides in Rockwall, Rockwall County, Texas.  She is the mother Tyrone E. Davenport and of Penny Maris and the grandmother of Ashley and Wendy Bracken.

27.     Melanie Davenport is a 22 year old female and is the daughter of Tyrone Davenport and the grandchild of Joyce Davenport.  She is a student and resides with her parents in Rockwall, Rockwall County, Texas.

28.     Travis Davenport is a 25 year old man and is the son of Tyrone Davenport and the grandchild of Joyce Davenport.  He is a computer engineer and resides with his parents in Rockwall, Rockwall County, Texas.

29.     Tyrone Davenport is a 51 year old man and is the son of Joyce Davenport and the father of Christi N. Davenport, Heather Davenport, Melanie Davenport and Travis Davenport.  He resides with his wife Cheryl Davenport in Rockwall, Rockwall County, Texas.

30.     Davenport Enterprises, Inc. is a Texas corporation.  Joyce Davenport is the President and registered agent of the corporation with its registered office being in Rockwall, Rockwall County, Texas.

31.     Billie J. Embrey is a 68 year old businesswoman working and residing in Longview, Gregg County, Texas.  She is the wife of Robert D. Embrey, the mother of Gary Embrey and the daughter of Estelle Smith.  She is also the Vice President of Remtex, Inc.

32.     Gary Embrey is a 38 year old businessman working and residing in Longview, Gregg County, Texas.  He is the son of Robert D. and Billie J. Embrey and the grandson of Estelle Smith.  He is also the registered agent, secretary and treasurer of Remtex, Inc.

33.     Robert D. Embrey is a 76 year old business man working and residing in Longview, Gregg County, Texas.  He is the husband of Billie J. Embrey, the father of Gary Embrey and the son-in-law of Estelle Smith.  He is also the President of Remtex, Inc.

34.     Dr. Jay T. Gordon is a dentist working and residing in Longview, Gregg County, Texas.

35.     Joost Gosschalk is a 53 year old salesman working and residing in Longview, Gregg County, Texas.  He is the father of Jonas A. Gosschalk.

36.     Jonas A. Gosschalk is a 24 year old intern working and residing in Longview, Gregg County, Texas.

37.     Carroll V. Guice is a chiropractic orthopedist working and residing in Longview, Gregg County, Texas.

38.     James M. and Penelope Hill are husband and wife and reside in Quitman, Wood County, Texas.  James M. Hill is a 56 year old business owner of a company located in Dallas, Dallas County, Texas, and resides in Quitman, Texas.

39.     Hoyl Oil & Mineral, Inc. is a Texas corporation owned and controlled by Joyce Davenport.

40.     William H. Hudspeth is a 49 year old businessman working and residing in Kilgore, Gregg County, Texas.

41.     O. L. Kimbrough is an 85 year old retired wholesale gasoline and automotive parts distributor.

42.     Jerry Landers is a 47 year old computer programmer working and residing in Houston, Harris County, Texas.  He is the son of Tom and Dorothy Landers and the brother of Michael C. Landers and Jerry Tom W. Landers III.

43.     Michael C. and Karen C. Landers are husband and wife, ages 52 and 50 respectively, and reside in Mandeville, Louisiana.  Michael C. Landers is a sales representative.

44.     Tom and Dorothy Landers are husband and wife, ages 77 and 76 respectively, and who reside in Longview, Gregg County, Texas.  Mr. Landers is a retired business owner of a Longview insurance agency.  Tom and Dorothy Landers are the parents of Michael C. Landers, Tommy W. Landers III and Jerry Landers.

45.     Tom and Dorothy Landers Family Trust is a trust established by Tom W. Landers and Dorothy E. Landers in 1991.  Tom W. Landers III is the trustee and resides in Santa Ana, California.

46.     Tom W. Landers is the 77 year old husband to Dorothy Landers and father to Jerry Landers, Michael C. Landers and Tom W. Landers III.

47.     Tom W. and Joan S. Landers III are husband and wife, ages 54 and 51 respectively, and reside in Santa Ana, California.  Tom W. Landers III is the son of Tom and Dorothy Landers and is the brother of Michael C. Landers and Jerry Landers.

48.    Orval T. Lindsey is a 52 year old pharmaceutical salesman, residing in Quitman, Wood County, Texas.

49.    William B. Lindsey is a 50 year old businessman in Kailua, Hawaii.

50.    Dr. Edward Mack is a 75 year old retired dentist, residing in Longview, Gregg County, Texas.

51.    Adam Taylor Mack is the 5 year old grandson of Dr. Edward Mack. Dr. Edward Mack is trustee and/or custodian and resides in Longview, Gregg County, Texas.

52.    Alicia Mack is the wife of Dr. Edward Mack. Dr. Edward Mack is the trustee on the note and both reside in Longview, Gregg County, Texas.

53.    Kelly Mack is the 44 year old son of Dr. Edward Mack and the father of Adam Taylor Mack and Sara Elizabeth Mack. Dr. Edward Mack is the trustee on the note and resides in Longview, Gregg County, Texas.

54.    Sara Elizabeth Mack is the 3 year old grandchild of Dr. Edward Mack. Dr. Edward Mack is the trustee on the note and resides in Longview, Gregg County, Texas.

55.    Mack Adventure, Ltd., is a Texas limited partnership and Dr. Edward Mack is the General Partner.

56.    W. M. Matthews, Jr. is a 74 year old retired rice farmer and cattle rancher, residing in Anahauc, Chambers County, Texas.

57.    Roger Moser, Sr. is 53 years old and is a General Manager working and residing in Longview, Gregg County, Texas.

58.    H. A. Orgain is a 90 year old man. Before retirement, Mr. Orgain was a retail merchant. He resides in Longview, Gregg County, Texas.

59.    Helen Phillips is a 70 year old schoolteacher working and residing in Longview, Gregg County, Texas.

60.    Rem Tex, Inc., is a Texas corporation established in 1971 and with its registered office in Longview, Gregg County, Texas.  Mr. Gary Embrey is the registered agent of the corporation.

61.    Michael Sanders is a physician specializing in the treatment of cancer and resides in Longview, Gregg County, Texas.

62.    Shiloh Christian Fellowship Church is a non-profit religious organization located in Terrell, Kaufman County, Texas.

63.    Estelle Smith is an 89 year old woman residing in Shreveport, Louisiana.  She is the mother of Billie J. Embrey.

64.    Bernard Taylor is a physician specializing in the treatment of cancer and resides in Longview, Gregg County, Texas.

B.    Defendants

65.    Irving D. Boyes is an individual residing in Dallas County, Texas.  He can be served with process at his place of business at 3333 Earhardt Drive, Suite 250, Carrollton, Texas 75006.

66.    Shirley A. Salkeld is an individual residing in Dallas County, Texas.  Ms. Salkeld may be served with process at her place of business at 3333 Earhardt Drive, Suite 250, Carrollton, Texas 75006.

67.    Michael J. Lively is an individual residing in Collin County, Texas.  Mr. Lively may be served with process at his residence at 1616 Thistledown Drive, Plano, Texas 75093-4903.

68.     Donald R. Iglehart is an individual residing in Dallas County, Texas.  Mr. Iglehart may be served with process at his residence at 3516 Colgate Avenue, Dallas, Texas 75225-5009.

69.     Stephen K. Morehead is an individual residing in Tarrant County, Texas.  Mr Morehead may be served with process at his place of business at 3333 Earhardt Drive, Suite 250, Carrollton, Texas 75006, or at his residence at 436 Shade Tree Circle, Hurst, Texas 76054.

70.     Gregory N. Boyes is an individual residing in Dallas County, Texas.  Mr. Boyes may be served with process at his place of business at 3333 Earhardt Drive, Suite 250, Carrollton, Texas 75006

71.     J. Marc Hesse is an individual residing and doing business in Dallas County, Texas.  Mr. Hesse may be served with process at his place of business at Hesse and Jones, 4949 Westgrove, Suite 200, Dallas, Texas 75248.

72.     Tudor Eastup & Co., P.C. is a professional corporation that provides independent accounting services from their office in Rockwall, Texas.  Tudor, Eastup & Company, P.C. may be served with process at their offices at 2255 Ridge Road, Suite 208, Rockwall, Texas 75087.

## II.

## JURISDICTION

73.     This action asserts claims under section 12(2) and section 15 of the Securities Act of 1933, 15 U.S.C. §77(l)(1) and (2), and 77o; section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b), SEC Rule 10b-5, 17 C.F.R. §240.10b-5, and 15 U.S.C. §78t, and pendent state claims.  Jurisdiction properly lies in this Court pursuant to 15 U.S.C. §77v(a), 15 U.S.C. §78aa, 28 U.S.C. §1367, and 28 U.S.C. §1331.

74.     Venue is proper in the Northern District of Texas because the Defendants reside in this District and the cause of action arose, in part, in this District.

### III.

### FACTS APPLICABLE TO ALL COUNTS

A.     Introduction

75.     Each of the Defendants was involved in the promotion, solicitation, and servicing of seventeen (17) different series of Note offerings, which produced over $14 million in funds for corporations owned and controlled by Irving D. Boyes (hereafter "Chartwell"). Although Chartwell held itself out to Plaintiffs as a family of healthy, profitable corporations centralized under one management and poised to "go public" by the year 2000, tax returns filed with the IRS show that Chartwell was losing millions of dollars each year, exceeding $10 million in losses in 1997. Throughout the relevant period, Chartwell's nursing homes lost substantial sums through intercompany "loans", lavish compensation packages for executive officers, the diversion of assets, and the use of affiliated vendors and management companies to drain lucrative nursing home revenues.

76.     The Plaintiffs named herein were induced to invest substantial sums of retirement funds, family trust funds, and other significant sums of money in ten-year promissory notes issued by newly formed Chartwell corporations based upon misrepresentations made by Irving D. Boyes, Stephen K. Morehead, and Kenneth B. Kimbrough, a selling agent who received over $500,000.00 from the Chartwell corporations in return for raising money from the Plaintiffs.

77.     These Chartwell officers, directly and through their selling agent, assured the Plaintiffs that the promissory notes were essentially backed by the U.S. Government in the form of Medicaid and Medicare-insured healthcare receivables.

78.     The nursing homes identified in the loan offering brochures were represented as established going concerns with a history of profitable operations.  Chartwell's officers, directly and through their selling agent, represented that the nursing homes would be administered by Chartwell's highly-qualified and experienced staff which purportedly had a track record of successful and profitable operations and a high margin of equity.  To induce the Plaintiffs to loan substantial sums of money to newly formed corporations on a long-term basis, Defendants Boyes and Morehead directly and through their selling agent, represented that the leases and licenses acquired with Plaintiffs' "purchase money loans" (and the Medicaid and Medicare receivables generated through these leases and licenses) were so valuable that the Plaintiffs would have more than adequate security if the nursing home operations failed.

79.     Each of the foregoing representations was false.  Chartwell's officers and selling agents quickly formed new corporations to hold the leases, licenses and provider agreements, and the corporations that signed notes to the Plaintiffs became nothing more than a vehicle to raise and distribute funds.   The assurance of a security interest in Medicaid and Medicare receivables was an empty promise with no intent to perform.   Chartwell defaulted on the promissory notes described in this Complaint in July 1998.  When the Plaintiffs attempted to enforce their security interests, they discovered that in virtually every case, the corporate entity that signed the Chartwell notes was not named in the leases, licenses, and Medicaid and Medicare provider agreements which formed the basis of Plaintiffs' security interests.

80.     The nursing homes acquired by Chartwell were rated "substandard" by the state and federal regulators, and many were only conditionally licensed under Chartwell's management.

81.     Finally, instead of turning around the problem homes, Chartwell's officers milked the revenue stream of the nursing homes to support lavish compensation packages for themselves and a myriad of new acquisitions of their own while defaulting on accounts payable and other healthcare obligations owed by the nursing homes.  Consequently, Chartwell became a target of the state and federal regulators who repeatedly sanctioned Chartwell's nursing homes with civil money penalties.  Several of Chartwell's Medicaid contracts were terminated and patients evacuated from the homes.

82.     The Plaintiffs, however, who resided in Longview and other small towns in Texas, were carefully insulated from any negative information about Chartwell.  Employing what he called "PMA Cops," Chartwell's CEO, Irving D. Boyes, insisted that Chartwell was a growing, lucrative enterprise that was poised to "go public" by the year 2000.  Anyone who didn't have the requisite positive mental attitude ("PMA") to agree with him was immediately terminated.

B.     East Texas Healthcare

83.     In early 1993, Plaintiffs Edward Mack, Tyrone E. Davenport, Joyce Ann Davenport, Pat S. Collier, Mike Collier, Dr. Jay T. Gordon, Travis Davenport, Heather Davenport, Melanie Davenport, Christie Davenport, O. L. Kimbrough (hereinafter "East Texas I Plaintiffs"), and others, were solicited to invest their retirement and other funds in promissory notes issued by a series of healthcare corporations formed by Irving D. Boyes and promoted by Chartwell Healthcare, Inc. for the purpose of acquiring nursing homes.  The corporations were represented to be part of the "Chartwell Group of Healthcare Companies" (hereinafter "Chartwell").  Defendants Boyes and Morehead were promoters who solicited Plaintiffs to purchase promissory notes with offering memoranda, brochures, and presentations.

84.     According to the spiral bound loan offering brochures distributed en masse to Plaintiffs, Chartwell Healthcare, Inc. was seeking $800,000.00 in unlimited increments to cover the lease and initial operating costs of three (3) nursing homes in East Texas. The Executive Summary falsely stated that:

> East Texas Healthcare I, Inc., East Texas Healthcare II, Inc., and East Texas Healthcare III, Inc. affiliated companies of Chartwell Healthcare, Inc., ., will lease and operate three (3) nursing home facilities in Texas (402 beds). The Corporations have entered into lease agreements with the present operators of the facilities to lease the land, buildings, improvements, furniture, fixtures, and equipment.

The three (3) nursing homes were identified in separate brochures as Colonial, Merritt and Suburban, in Marshall, Texas. In fact, neither Chartwell nor its affiliated companies had any agreement for lease of these facilities at the time they were raising funds from the Plaintiffs. The Summary contained a seven-year (7) cash flow projection for the three (3) nursing homes and affirmatively stated that "Cash flow will be at least three times (3.0x) the principal, interest and participation amounts."

85.     Chartwell's promoters, including Defendants Boyes and Morehead, directly and through their selling agent, stressed that the notes were secured by nursing home receivables -- receivables which were insured by state Medicaid and federal Medicare funds. These promoters failed to disclose the compensation they were receiving from the sale of the notes or the conflicts of interest that permeated the offering, and openly boasted that Medicare would have to go broke before the investors would lose money on this investment. Mr. Kenneth Kimbrough signed a personal guarantee on at least one of the notes and stated that he had invested substantial sums of his own money in the same notes he was soliciting. He did not disclose that Defendant Boyes agreed to compensate him with commissions, bonuses, and other fees that would more than offset the amounts he advanced for the purchase of Chartwell notes.

86.     The promoters included with the loan offering memorandum a brochure describing the parent corporation, Chartwell Healthcare, Inc. This brochure made the following false and misleading statements about the Chartwell Group of Healthcare Companies:

(a)     "Current annual revenues for the Chartwell Group of Healthcare Companies are at $38 million with operating profits in excess of 25%."

(b)     "Chartwell Healthcare, Inc. presently owns and/or operates seventeen (17) facilities in Texas, Oklahoma and Louisiana."

(c)     "Under Mr. Boyes' leadership, the Chartwell Group of Companies has completed in excess of $68 million dollars of nursing home and real estate acquisitions during the past five years."

(d)     "The growth in Nursing Home residency will increase by 280% between now and the year 2000. One new 120-bed Nursing Home will have to be opened everyday until the year 2000 just to keep even with the demand."

(e)     Chartwell Healthcare, Inc., and its group of companies, has common officers and managers specializing in providing management services to nursing homes [including Irving D. Boyes, as President; Michael J. Lively as Executive Vice President; Donald R. Iglehart as Vice President-Accounting; and Steve K. Morehead, CPA, as Vice President-Finance].

87.     The East Texas I Plaintiffs invested cash for the purchase of promissory notes made and delivered by East Texas Healthcare I, Inc. payable monthly over seven (7) years with interest at 12% and containing a "participation interest" based upon the gross proceeds of the nursing homes. The promissory notes were dated on or about May 12, 1993, and each contained a financing statement which stated that each noteholder would receive a first mortgage security interest of a proportionate amount of the "receivables of the nursing homes under lease to East Texas Healthcare I, Inc." Defendants Boyes and Morehead told the Plaintiffs in presentations conducted in Longview and elsewhere that East Texas Healthcare I, Inc. had and would lease three (3) nursing homes in Marshall, Texas, and that the healthcare receivables of all three (3) nursing homes would secure the East Texas Healthcare I, Inc. promissory notes.

88.   On information and belief, the promissory notes were drafted, reviewed, and approved by defendant Irving D. Boyes and defendant J. Marc Hesse.  The amounts of the promissory notes owned and held by each of the East Texas I Plaintiffs and the proportionate amount of receivables conveyed as security are as follows:

| | | |
|---|---|---|
| O. L. Kimbrough | $75,500.00 | (75.5/800 of 75% of the receivables) |
| Edward Mack | $50,000.00 | (50/800 of 75% of the receivables) |
| Tyrone E. Davenport, (IRA) | $25,000.00 | (25/800 of 75% of the receivables) |
| Joyce Ann Davenport | $25,000.00 | (25/800 of 75% of the receivables) |
| Pat S. Collier | $25,000.00 | (25/800 of 75% of the receivables) |
| Mike Collier | $25,000.00 | (25/800 of 75% of the receivables) |
| Dr. Jay T. Gordon | $25,000.00 | (25/800 of 75% of the receivables) |
| Travis Davenport | $8,500.00 | (8.5/800 of 75% of the receivables) |
| Heather Davenport | $8,500.00 | (8.5/800 of 75% of the receivables) |
| Melanie Davenport | $4,000.00 | (4/800 of 75% of the receivables) |
| Christie Davenport | $4,000.00 | (4/800 of 75% of the receivables) |

89.   Subsequently, in October 1993, the same promoters distributed a second loan offering request for $1.2 million for the acquisition of seven (7) nursing homes in East Texas or 788 beds.  The Executive Summary falsely stated that:  "East Texas Healthcare, Inc. has contracted to lease seven (7) nursing home facilities (788 beds)."  The seven (7) nursing homes were identified as:  (1) Merritt Plaza Nursing Home, (2) Colonial Park Nursing Home, (3) Suburban Acres Nursing Home, (4) Leisure Lodge of Junction, (5) Crockett Nursing Center, (6) Westview Care Center in Seymour, and (7) Leisure Lodge of Lampasas.  The Executive Summary failed to disclose that the offering involved the same three (3) nursing home receivables previously conveyed to the East Texas Healthcare I, Inc. noteholders as security. Indeed, Chartwell's selling agent misrepresented that the East Texas Healthcare II offering involved seven (7) new nursing homes separate and apart from the three (3) nursing homes acquired in the East Texas Healthcare I offering.  He told the Plaintiffs in presentations conducted in Longview and elsewhere that East Texas Healthcare II, Inc. had a commitment to

lease and would lease seven (7) additional nursing homes in Texas and that the healthcare receivables of all seven (7) nursing homes would secure the East Texas Healthcare II, Inc. promissory notes. Defendants Boyes and Morehead emphasized during individual presentations to Plaintiff Mike Collier and others that the leases and licenses that would be obtained by East Texas Healthcare II were so valuable that there was ample security to support the amounts funded during the ten year term of the loans.

90.     After submission to the East Texas II Plaintiffs, the offering was amended as being a lease acquisition under the corporate name East Texas Healthcare II, Inc. East Texas Healthcare I, Inc. was incorporated under the laws of Texas on May 12, 1993. East Texas Healthcare II, Inc. was incorporated on September 20, 1993.

91.     East Texas Healthcare, Inc. was incorporated on September 20, 1993. On the same date, East Texas Healthcare I, Inc. entered into a written Agreement and Sublease of Nursing Home Properties with Beverly Enterprises-Texas, Inc., a California corporation. The agreement provided that East Texas Healthcare I, Inc., and/or any of its related affiliates would purchase seven (7) nursing homes and lease three (3) nursing homes in Texas for a purchase price of $14,500,000 plus security deposits and rent. The three (3) leased facilities were Merritt Plaza, Colonial Park and Suburban Acres, all in Marshall, Texas. The seven (7) nursing homes to be purchased included Crockett, Seymour, Lampasas and Junction, plus two (2) additional nursing homes, San Angelo and Clarksville.

92.     In October 1993, Plaintiffs Edward Mack, Alicia Mack, H. A.Orgain, Adam Taylor Mack, Pat S. Collier, Mike Collier (hereinafter East Texas II Plaintiffs) invested cash for the purchase of promissory notes made and delivered by East Texas Healthcare II, Inc. payable monthly over seven (7) years with interest at 12% and containing a participation interest

based on the gross proceeds of the nursing homes. The promissory notes were dated on or about October 18, 1993, and each included a financing statement which falsely stated that each noteholder would receive a first mortgage security interest of a proportionate amount of the "receivables of the nursing homes under lease to East Texas Healthcare II, Inc." On information and belief, the promissory notes were drafted, reviewed and approved by defendant Irving D. Boyes and J. Marc Hesse. The loan offering materials clearly misrepresented that these included the receivables of seven (7) different nursing homes. The amounts of the promissory notes owned and held by each of the East Texas II Plaintiffs and the proportionate amount of the receivables conveyed as security are as follows:

| Edward Mack | $50,000.00 | (50,000/1,200,000 of 75%) |
|---|---|---|
| Alicia Mack | $25,000.00 | (25,000/1,200,000 of 75%) |
| H. A. Orgain | $25,000.00 | (25,000/1,200,000 of 75%) |
| Adam Taylor Mack | $25,000.00 | (25,000/1,200,000 of 75%) |
| Pat S. Collier | $25,000.00 | (25,000/1,200,000 of 75%) |
| Mike Collier | $25,000.00 | (25,000/1,200,000 of 75%) |

93. On information and belief, Chartwell was unable to close the September 20, 1993 purchase by the closing date of October 29, 1993. Instead of disclosing this fact to the Plaintiffs, however, Chartwell used the $1.8 million it raised from individuals in East Texas and renegotiated the Agreement with Beverly on November 23, 1993, to provide for a sublease of the three (3) Marshall facilities and a lease of the Seymour, Junction, Lampasas and Crockett facilities for $1.4 million in "Transfer Consideration." This agreement closed on December 9, 1993. The Memorandum of Sublease was executed by East Texas Healthcare I, Inc. on behalf of all three (3) of the Marshall Nursing homes. The actual Sublease agreements, however, limited the property interest of East Texas Healthcare I, Inc. to Merritt Plaza. East Texas Healthcare II, Inc. executed a sublease on behalf of Colonial Park.

94.     By letter dated November 24, 1993, using a draft letter written by his attorney, J. Marc Hesse, Defendant Irving D. Boyes falsely stated that the modification of the lease agreement with Beverly would not affect the terms of the notes previously purchased by Plaintiffs. Boyes never revealed that East Texas Healthcare I and II did not acquire the property rights on which the loan requests to Plaintiffs were predicated.

95.     The same Chartwell promoters, including Defendants Boyes and Morehead, sold a third series of promissory notes in the name of East Texas Healthcare, Inc., apparently using the same offering materials distributed in connection with the East Texas Healthcare I and II offering. Joe A. and Sylvia A. Collier on behalf of their daughter Alison Blair Collier and as Trustees on behalf of their grandchildren, Clark Collier Orren and Joel Patrick Collier, Jr., O. L. Kimbrough, Dr. Edward Mack and W. M. Matthews (hereinafter "East Texas Plaintiffs") invested cash for the purchase of promissory notes made and delivered by East Texas Healthcare, Inc. payable over ten years with interest at 12% and containing a participation interest based on the gross proceeds of the nursing homes. The promissory notes, which are owned and held by each of the East Texas Noteholders, were dated on the following dates for the amounts specified below:

November 29, 1993 - Alison Blair Orren, $25,000.00

November 29, 1993 and January 3, 1994 - Joel Patrick Collier, Jr., $20,000.00 and $20,000.00, respectively

November 29, 1993 and January 3, 1994 - Clark Collier Orren, $20,000.00 and $20,000.00, respectively

January 3, 1994 - O. L. Kimbrough, $10,000.00

March 21, 1994 - Edward Mack, $100,000.00

March 31, 1994 - W. M. Matthews, $60,000.00

96.     Each of the notes included a financing statement which falsely stated that each noteholder would receive a first mortgage security interest in a proportionate amount of the "receivables of the nursing homes under lease to East Texas Healthcare, Inc" on information and belief, the promissory notes were drafted, reviewed, and approved by Defendants Irving D. Boyes and J. Marc Hesse.  The fractional interests are identified below:

| | |
|---|---|
| Alison Blair Orren | 25,000/2,000,000 of 75% of the receivables for each note |
| Joel Patrick Collier, Jr. | 20,000/2,000,000 of 75% of the receivables for each note |
| Clark Collier Orren | 20,000/2,000,000 of 75% of the receivables for each note |
| O. L. Kimbrough | 10,000/2,000,000 of 75% of the receivables for each note |
| Edward Mack | 100,000/2,000,000 of 75% of the receivables for each note |
| W. M. Matthews | 60,000/2,000,000 of 75% of the receivables for each note |

Although by this time, Mr. Boyes and the promoters clearly knew that East Texas Healthcare, Inc. would not acquire any rights under the lease agreements with Beverly, they continued to represent that notes signed by East Texas Healthcare, Inc. would be secured by the Medicare and Medicaid receivables of the seven (7) nursing homes.

C.     Chartwell Healthcare of Wisconsin/Chartwell Healthcare of Missouri, Inc.

97.     On or about August 15, 1994, the Chartwell promoters solicited individual investors to purchase notes aggregating $1 million issued by Chartwell Healthcare of Wisconsin, Inc.  The loan offering materials were presented under the name, Chartwell Healthcare, Inc., by defendant Steve K. Morehead, Director of Finance - Acquisitions.  The purpose of the offering was to finance the acquisition of the following three (3) nursing home facilities located in Wisconsin:  Jackson Center Nursing Home and Plymouth Manor Nursing Home in Milwaukee, and Hearthside Rehab Center in Brown Dear.  The Executive Summary of the Loan Offering Memoranda stated that "Chartwell Healthcare, Inc. has contracted to purchase three (3) facilities . . . in the metropolitan Milwaukee area."  The notes were described as "purchase money loans."

98.     The following Plaintiffs advanced funds payable to Chartwell Healthcare, Inc. and Chartwell Healthcare of Wisconsin, Inc. in return for promissory notes of the latter corporation dated on or about August 15, 1994, payable over ten (10) years and secured by "a mortgage on the receivables of the three nursing homes acquired by Chartwell of Wisconsin, Inc., in an amount equal to 100% of the loan outstanding to the 'Lender":

| | |
|---|---|
| Dr. Edward Mack | $100,000.00 |
| W. M. Matthews, Jr. | $ 60,000.00 |
| Mike Collier | $ 48,000.00 |
| Joyce Ann Davenport | $ 50,000.00 |
| Tyrone E. Davenport | $ 48,000.00 |
| Tyrone E. Davenport | $ 7,870.00 |
| Travis Davenport | $ 5,500.00 |
| Melanie Davenport | $ 4,000.00 |
| Christie Davenport | $ 2,000.00 |
| Heather Davenport | $ 1,600.00 |
| Clark Collier Orren 1993 Trust | $ 40,000.00 |
| Clark Collier Orren GP Trust, formerly Joe and Sylvia Collier | $ 20,000.00 |
| Jay Gordon, M.D. | $ 25,000.00 |
| Joel Patrick Collier, Jr. 1993 Trust, formerly Joe and Sylvia Collier | $ 40,000.00 |
| Joel Patrick Collier, Jr. GP Trust, formerly Joe and Sylvia Collier | $ 25,000.00 |
| O. L. Kimbrough | $ 25,000.00 |
| H. A. Orgain | $ 25,000.00 |

99.     By letter dated September 13, 1994, Irving D. Boyes as President of Chartwell Healthcare of Wisconsin, Inc., informed Plaintiffs that the closing of the Wisconsin nursing homes had been delayed until October 31, 1994, for the following reasons:

An integral part of the transaction is the transfer of 50 licensed beds, by the seller to another location owned by the seller. This transfer would leave a total of 482 licensed beds to be acquired by Chartwell Healthcare of Wisconsin, Inc. as originally agreed. The transfer of this 50 bed license requires State approval. Although the seller has submitted the necessary information to obtain State approval, the State of Wisconsin has not yet approved the license transfer.

The above statements were false. Chartwell failed to close this transaction because it was unable to obtain sufficient financing for the purchase.

100. On November 18, 1994, Mr. Boyes, now as President of Chartwell Healthcare, Inc., notified Plaintiffs that the closing had been twice postponed and "while it is scheduled for December 31, 1994, the seller has indicated it may be January or later in 1995 before the close will take place."

101. Instead of closing on the Wisconsin homes, Mr. Boyes stated that:

Our proposal is for your funds, originally loaned to CHWI, be transferred and loaned to CHMO to facilitate the closing of this transaction. The closing [of the new Missouri transaction using Plaintiffs' funds] is scheduled for Monday, November 28, 1994.

Mr. Boyes recommended that Plaintiffs accept new notes secured by the accounts receivable of twelve (12) nursing homes in Missouri because it would more effectively "diversify risk" and because the "Missouri project has more revenues, some $22 million annually."

102. Based upon Mr. Boyes' representations, some of the Plaintiffs expressly consented to the transfer. By letter dated December 1, 1994, Mr. Boyes, now as President of Chartwell Healthcare of Missouri, Inc., notified the Plaintiffs that "the Missouri acquisition has been completed."

103. Mr. Boyes failed to disclose the following material facts about the Plaintiffs' investment in the Chartwell Healthcare of Missouri, Inc. acquisition:

(a) that the assets of the nursing homes, including the Medicare and Medicaid receivables, would be owned and held by separate corporations which were not named in the financing statements securing the promissory notes;

(b) that the transfer of the sublease of the nursing homes had not been approved by the owners of the real property, and that such owners had the right which they subsequently exercised, to eject Chartwell's affiliates and employees from the premises;

(c)     that some of the nursing homes were not licensed, and Fulton Community Care had a probationary license scheduled to expire on April 15, 1996;

(d)     that seven (7) of the nursing homes had over $700,000.00 in unpaid vendor accounts outstanding;

(e)     that the lease payments for the acquisition would total $401,975.59 per month with an additional $50,000.00 in bank debt due each month to the sublessor;

(f)     that the IRS had levied on seven (7) nursing homes for unpaid payroll taxes aggregating $674,421.88; and

(g)     that Chartwell Healthcare of Missouri, Inc. did not have sufficient funds to operate the nursing homes even after the loan offering to the Plaintiffs was funded.

104.     In a letter dated January 31, 1995, letter, Mr. Boyes stated that Chartwell Healthcare of Missouri, Inc. purchased eleven (11) corporations and their assets. He misrepresented that:

"The assets include owning the nursing home businesses, leases and subleases of the following properties:

1.     Perry Oaks Healthcare located in Perryville, Missouri containing 150 beds.

2.     Brookside Nursing Center located in Sweet Springs, Missouri containing 120 beds.

3.     Mark Twain Caring Center located in Poplar Bluff, Missouri containing 120 beds.

4.     Greentree Nursing Center located in Warrenton, Missouri containing 120 beds.

5.     Fulton Community Care located in Fulton Missouri containing 100 beds.

6.     Eldon Healthcare located in Eldon, Missouri containing 90 beds.

7.    ClaRu DeVille Nursing Center located in Fredericktown, Missouri containing 90 beds.

8.    East Hill Health Care located in Carrollton, Missouri containing 63 beds.

9.    Lincoln Minor Nursing Center located in Chillicothe, Missouri containing 60 beds.

10.   Glenwood Healthcare located in Seymour, Missouri containing 60 beds.

11.   Silex Community Care located in Silex, Missouri containing 60 beds."

In fact, Chartwell Healthcare of Missouri, Inc. did not purchase the assets of the foregoing nursing homes. It only purchased the stock of corporations previously operating these homes.

105.   On March 22, 1995, Irving D. Boyes as President of Chartwell Healthcare of Missouri, Inc., issued new promissory notes to each of the Plaintiffs listed in paragraph 98, above, as President of Chartwell Healthcare of Missouri, Inc. Each of the notes were again described as "purchase money loans." The notes attached a "Financing Agreement" pursuant to which Defendants Boyes, Morehead, and Hesse represented that "Nursing Home [defined as Chartwell Healthcare of Missouri, Inc.] does hereby give a mortgage on the receivables of the nursing homes acquired by Chartwell of Missouri, Inc. in an amount equal to 100% of the loan outstanding to the 'Lender'." Defendants Boyes, Morehead, and Hesse knew or should have known that the financing statements would not convey the security interest they promised to convey to the Plaintiffs. In fact, these Defendants had already arranged with the State of Missouri for Medicaid receivables to be paid to separate Chartwell corporations, not Chartwell Healthcare of Missouri, Inc.

D.    **C.M., Inc. ("CMI")**

106.    In December 1994, Chartwell Healthcare of Missouri, Inc. solicited loans for an additional $400,000.00 in order to consummate the purchase of four (4) nursing homes in Missouri, including "acquisitions and transition costs, together with immediate working capital to meet payrolls prior to receipt of Medicaid and Medicare payments."

107.    The loan offering memoranda blatantly misrepresented that "Chartwell Healthcare of Missouri, Inc. has acquired four (4) Missouri Long Term Care Facilities including all of their assets and certain limited liabilities." Chartwell's promoters and agents, including Boyes and Morehead, knew that the nursing home assets had not been acquired by Chartwell Healthcare of Missouri, Inc., and that the sublease finally executed in January 1995 would convey lease rights only to the following newly formed corporate entities never identified to the Plaintiffs:

    Carrollton Nursing Center, Inc.
    Fayette Nursing Center, Inc.
    Platte City Nursing Center, Inc.
    Halls Ferry Nursing Center, Inc.

On December 16, 1995, these corporations were formed under the laws of the State of Missouri at the direction of Chartwell's attorney, J. Marc Hesse. The nursing homes were identified by number of beds and occupancy, as follows:

|     |                                                          | #Beds | Occupancy |
|-----|----------------------------------------------------------|-------|-----------|
| a.  | Carrollton Nursing Center<br>Carrollton, Missouri        | 120   | 68.3%     |
| b.  | Halls Ferry Nursing Center<br>St. Louis, Missouri        | 94    | 100.0%    |
| c.  | Platte City Caring Center<br>Platte City, Missouri       | 120   | 75.0%     |
| d.  | Fayette Caring Center<br>Fayette, Missouri               | 60    | 63.3%     |

Total   394   77.15%

108.   The terms of the individual notes were stated in the loan request as the following:

| | |
|---|---|
| Borrower: | Chartwell Healthcare of Missouri, Inc. |
| Term & Amortization: | 10 years |
| Interest Rate: | 12% |
| Participation: | .36% of one percent of cash receipts (0.36%) |

109.   Plaintiffs Jay T. Gordon and B. Hull Barbee invested $25,000 each for the purchase of these notes, and Plaintiff O. L. Kimbrough invested $12,500.00 in reliance upon the representations contained in the loan offering memoranda and other representations. These Plaintiffs are referenced herein as the "CMI Plaintiffs." Each of CMI Plaintiffs made their checks payable to Chartwell Healthcare of Missouri II based upon the Chartwell promoters' representations that Chartwell Healthcare of Missouri II, Inc. would own and operate the subject nursing home. In fact Chartwell Healthcare of Missouri II, Inc. was never even incorporated and had no property interest in the nursing homes which purportedly secured the notes. The designation Chartwell Healthcare of Missouri II referred to as a bank account at Equitable Bank in Dallas held in the name of Chartwell Healthcare of Missouri -- Operating Account II. It was this account that funded the acquisition costs for the leases referenced herein.

110.   Each of the CMI Plaintiffs received promissory notes dated on or about December 27, 1994, made by Irving D. Boyes as President of Chartwell Healthcare of Missouri II, Inc. On information and belief, the promissory notes were drafted, reviewed, and approved by Defendants Irving D. Boyes and J. Marc Hesse. The notes were payable over ten (10) years for the principal amounts stated in paragraph 109, above, and provided for monthly payments of principal and interest at 12%. The notes included a financing statement where Nursing Home (defined as Chartwell Healthcare of Missouri II, Inc.) "does hereby give a mortgage on the receivables of the three (3) nursing homes acquired by Chartwell of Missouri II, Inc. in an

amount equal to 100% of the loan outstanding to the 'Lender'." Defendants Boyes, Morehead, and Hesse knew or should have known that the financing statements would not convey the security interest they promised to convey to the Plaintiffs because of the new corporations they formed to take title to the nursing home assets.

E.    Chartwell Healthcare of Oklahoma, Inc./Chartwell Healthcare of Indiana, Inc./Chartwell Healthcare Services of Missouri, Inc.

111.    On or about June 3, 1995, Chartwell issued another loan offering solicitation for $700,000.00 in funds for the acquisition of five (5) Oklahoma nursing homes. The loan request was presented in the name of Chartwell Healthcare of Oklahoma, Inc.

112.    According to the loan offering memorandum, the $700,000 "will enable the Company to consummate the lease of these facilities, acquisition and transition costs, together with immediate working capital to meet payrolls prior to the receipt of Medicaid payments."

113.    The loan offering brochures represented the terms of the notes sold by Chartwell Healthcare of Oklahoma, Inc. as follows:

| | |
|---|---|
| Term & Amortization: | 10 years |
| Interest Rate: | 12% |
| Participation | .79 of one percent of cash receipts (.79%) |

The notes were described by Irving D. Boyes in written correspondence as "purchase money loans."

114.    Each of the following Plaintiffs advanced cash funds payable to Chartwell Healthcare of Oklahoma, Inc. in reliance on the written and other representations of Chartwell promoters:

| | |
|---|---|
| B. Hull Barbee | $  50,000.00 |
| Helen C. Barbee | $  25,000.00 |
| Bobby Collier | $  25,000.00 |
| Curtis Collier (minor) | $  10,000.00 |
| Joel Patrick Collier, Jr. 1993 Trust | $  30,000.00 |

| | |
|---|---|
| Michael Collier, Jr. | $ 10,000.00 |
| Mike Collier | $ 80,000.00 |
| Pat S. Collier | $ 25,000.00 |
| Joyce Ann Davenport | $ 25,000.00 |
| Tyrone E. Davenport | $ 50,000.00 |
| H. A. Orgain | $ 25,000.00 |
| Clark Collier Orren 1993 Trust | $ 30,000.00 |

These Plaintiffs are collectively referenced herein as the "CHOK Plaintiffs". In return, each of the CHOK Plaintiffs received promissory notes dated on or around June 1, 1995. The promissory notes were payable on a monthly basis over ten (10) years. The notes contained a provision for participation rights under which:

> Chartwell agrees to pay or cause the payment to Payee, monthly payments in an amount equal to [the proportion of the amount paid by each Payee over the $700,000 total offering] of .79 of one percent (0.79%) of the gross proceeds received by Chartwell Healthcare of Oklahoma, Inc. from the Facilities until such time as the outstanding original principal balance of any outstanding indebtedness has been repaid. Said payments to be made to Payee by the 15th of each month, beginning forty-five days after the Closing.

115.    The notes were "additionally secured," according to Defendants Boyes, Hesse, and Morehead by an assignment of the receivables of the Facilities up to the amount equal to the Note.

116.    On or about July 11, 1995, the CHSMO Plaintiffs received a letter from Irving D. Boyes, this time as Chairman of the Board and Chief Executive Officer of Chartwell Healthcare, Inc. The letter stated that "the owner/landlord is delaying the consummation of this transaction due to matters outside the control of CHO." Instead of using the funds he already collected in connection with a proposed acquisition of Oklahoma nursing homes, Mr. Boyes affirmatively represented and proposed the following on July 11, 1995:

> Due to the delay caused by the owner/landlord in connection with the Oklahoma transaction, Chartwell would like to propose that each lender participate in another transaction recently negotiated by Chartwell Healthcare of Indiana, Inc. ("CHI"). CHI has entered into a letter of intent to lease fifty-three (53) nursing

home facilities in the states of Indiana and Illinois. As part of our proposal, Chartwell would like for you to transfer the funds loaned to CHO to CHI to facilitate the consummation of the Indiana transaction. <u>The closing is scheduled for August 1, 1995.</u>

On information and belief, CHI had no contract to acquire Oklahoma nursing homes on August

1, 1995.

      117.    Mr. Boyes described the benefits of the transaction, as follows:

          1.    A diversification of risk.

          2.    Geographical diversification being in 53 locations, 51 various county seats in the State of Indiana and 2 in the State of Illinois.

          3.    Because the revenues in the Indiana project are far greater than anticipated from the Oklahoma project, the percent of participation in cash receipts will be reduced to .22% of the Indiana project, however, the rate of return will be the same as originally projected.

          4.    Scheduled increases in the Medicaid reimbursement rate in the State of Indiana will increase receipts.

          5.    The geographical distribution of the facilities and the services they offer creates an opportunity for managed care.

          6.    The Indiana-Illinois project has in excess of $60 million in annual revenues.

      118.    The CHOK Plaintiffs were requested to send back the original notes they received

from Chartwell Healthcare of Oklahoma, Inc. and exchange them for promissory notes made and

delivered by Chartwell Healthcare of Indiana, Inc.

      119.    In order to consummate the Indiana transaction, Chartwell's promoters sought an

additional $1.3 million in funding from individuals in East Texas who had never before invested

in Chartwell notes.

120.   In order to obtain additional funds, Chartwell's promoters distributed a loan offering brochure on or around September 5, 1995, entitled "Chartwell Healthcare of Indiana, Inc. - $2,000,000 Loan Request."  The Executive Summary stated that "Chartwell Healthcare of Indiana, Inc. is acquiring fifty-one (51) Indiana and two (2) Illinois Long Term Care Facilities."  According to the brochure, "[t]hese facilities have been in operation for a number of years and historically show significant cash flow from operations."  The brochure identified the names of the fifty-three (53) nursing homes, their location, number of beds, and occupancy. The terms of the loan offering were identified as follows:

| | |
|---|---|
| Borrower: | Chartwell Healthcare of Indiana, Inc. |
| Term: | 10 years |
| Interest Rate: | 12% |
| Participation: | .22 of one percent of cash receipts (0.22%) |

The notes were described by Irving D. Boyes as "purchase money loans."

121.   Based upon the representations of Chartwell's promoters and the loan offering brochures, CHOK notes for Chartwell Healthcare of Indiana, Inc. notes, and the following additional plaintiffs invested in promissory notes made and delivered by Chartwell Healthcare of Indiana, Inc.:

| | | |
|---|---|---|
| (a) | William H. Hudspeth | $75,000.00 |
| (b) | Bill H. Barbee | $50,000.00 |
| (c) | F. E. Brown, Jr. | $50,000.00 |
| (d) | Davenport Enterprises, Inc. | $25,000.00 |
| (e) | Heather Davenport (Ruffin) | $25,000.00 |
| (f) | O. L. Kimbrough | $25,000.00 |
| (g) | Kelly Mack, c/o Dr. Edward Mack | $50,000.00 |
| (h) | Tom W. Landers | $25,000.00 |

| (i) | Joost Gosschalk | $25,000.00 |
| (j) | Jay Gordon | $25,000.00 |

The CHOK Plaintiffs and the above individual investors in Chartwell Healthcare of Indiana, Inc., are collectively referred to herein as the "CHII Plaintiffs."

122.    The Indiana promissory notes, dated July 11, 1995, contained a provision for participation rights based upon the gross proceeds of the facilities acquired by Chartwell Healthcare of Indiana, Inc. They also incorporated, for the first time, a Confidential Private Placement Agreement and Subscription Agreement for Promissory Notes, which the Chartwell promoters distributed to prospective notes purchasers in or around August 1995. On information and belief, both the notes and the additional "subscription" documents were drafted, reviewed, and approved for dissemination by Defendants Irving D. Boyes and J. Marc Hesse.

123.    On information and belief, the "Confidential Private Placement Memorandum" was simply the loan offering brochure which was not restricted as to distribution or otherwise controlled in any way. The Subscription Agreement included two (2) copies of the proposed participating promissory note, and acknowledged the following facts concerning Chartwell Healthcare of Indiana, Inc.:

>       (a)    "[Chartwell Healthcare of Indiana, Inc.] has no history of operations or earnings, however, the parent company of Chartwell, Chartwell Healthcare, Inc., currently operates thirty seven (37) nursing home facilities and has been in operation for a number of years."

>       (b)    "Chartwell may enter into agreements and transactions with affiliates of Chartwell which may be deemed to involved conflicts of interests as set forth in the Memorandum. The undersigned hereby consents to the existence of such conflicts of interests on the terms and as described in the Memorandum."

>       (c)    "[T]here are substantial restrictions on the transferability of the Notes. Since the Notes will not be . . . registered under the 1933 Act or any applicable state securities law, the Notes may not be, and the undersigned hereby

>agrees that they shall not be sold, pledged, hypothecated or otherwise transferred
>unless such transfer is exempt from registration under the 1933 Act and all
>applicable state securities laws."

The conflicts of interest, however, were never addressed in any Confidential Private Placement Memorandum provided to the CHII Plaintiffs.

124.    Although the subscription agreement purported to restrict the persons who purchased Chartwell Healthcare of Indiana, Inc. promissory notes, Chartwell's promoters did not restrict the offering in any way and freely took money from those who made clear on the offering questionnaires that they were not accredited or suitable investors for this kind of offering.    For example, Plaintiff William H. Hudspeth clearly wrote on his offering questionnaire dated August 30, 1995, that "I am not an 'accredited investor'."   Chartwell's promoters, however, took his $75,000.00 check and returned a CHII promissory note identical to the other notes described herein.

125.    By the Fall of 1995, Chartwell was severely short on cash and desperate for new funds.  Because of disciplinary proceedings initiated by the State of Missouri, Chartwell incurred over $1 million in expenses over revenues collected for operation of the Chartwell Healthcare of Missouri, Inc. nursing homes.  The same year, Chartwell's management of eight (8) nursing homes was abruptly terminated when the owners of the facilities filed for bankruptcy protection. Chartwell agreed to waive almost a full year of management fees after the trustees in the Heartway bankruptcy proceedings accused Chartwell's management firms (Addison Healthcare and Mayfair Healthcare) of self-dealing and improper expenditures.  Finally, nursing home expenses were climbing because of lavish compensation packages provided to executive officers and third party contracts Chartwell entered into with affiliated and non-affiliated companies to provide services to the nursing homes.

126. To meet the heavy demands for funding, Chartwell's more lucrative nursing homes loaned out substantial sums of intercompany loans to nursing homes in need of cash. Chartwell used funds billed on behalf of third party vendors, and aggressively floated cash intended for other purposes. This led one vendor to file litigation against Chartwell in 1996 and successfully obtain an Order freezing all of Chartwell's company accounts at Equitable Bank. Chartwell also used money funded by the Plaintiffs for working capital needs of other nursing homes.

127. In order to get new financing, Steve Morehead arranged to obtain "review opinions" from independent accountants that overstated Chartwell's financial condition. The accounting firm, Tudor Eastup & Co., P.C., previously employed Morehead, but this affiliation was not disclosed on the financial statements. This firm significantly overstated Chartwell's assets, profitability, income, and net worth for each of the years 1994, 1995, 1996, and 1997. The review opinions stated that there were no material modifications that should be made to Chartwell's financial statements in order for them to be in conformity with generally accepted accounting principles. This defendant knew or should have known that material factors existed in 1995, 1996, 1997, and 1998, that would threaten Chartwell's ability to operate as a going concern.

128. Defendants Boyes, Morehead, and Iglehart each participated in communications to the Plaintiffs which they knew or should have known would mislead the Plaintiffs to believe that Chartwell's nursing home operations were healthy and profitable. At defendant Boyes instructions, defendant Iglehart froze the monthly participation checks to Plaintiffs so that reductions in operating revenue at the nursing homes would not be reflected in the monthly

checks. The checks, therefore, constituted a misrepresentation to Plaintiffs concerning the financial condition of Chartwell's nursing homes.

129.    Defendant Boyes and Morehead prepared "special" financial reports for their selling agent, Kenneth Kimbrough, which they knew he would use to misstate Chartwell's financial condition to the Plaintiffs. Defendant Morehead also forwarded the Tudor Eastup review report to Longview Bank & Trust where Plaintiff O.L. Kimbrough was a director, knowing that the findings of the report would be disseminated and relied upon by this Plaintiff and other Plaintiffs in Longview.

130.    On or about December 11, 1995, after raising $2 million for fifty-seven (57) nursing homes it never acquired, Irving D. Boyes, this time as President of Chartwell Healthcare Services of Missouri, Inc., USA Pharmacy, Inc., and Chartwell Healthcare Services of Indiana, Inc., wrote to the CHII Plaintiffs, and falsely stated that:

> [D]ue to unforeseen circumstances, the transaction, as originally structured, has not been consummated. The owner of the Indiana facilities has proposed another transaction that involves only 22 nursing home facilities. CHII is very interested in the smaller transaction and believes this provides an opportunity for each lender to participate in two additional transactions.

131.    Chartwell's promoters proposed and anticipated that the CHII Plaintiffs would allow Chartwell to use their funds for a completely new transaction scheduled to close less than two (2) weeks after the CHII Plaintiffs were given notice of the transaction. Defendants Boyes and Morehead failed to disclose, although they had a duty to disclose, Chartwell's precarious financial condition, the substantial intercompany loans, the escalation in unpaid bills, the substantial losses incurred by Chartwell's Missouri nursing homes, and the significant regulatory actions and litigation that had been initiated against Chartwell and its subsidiaries.

132.    On December 11, 1995, Mr. Boyes misrepresented the terms of this new proposed

offering as follows:

Project 1:    The number of Indiana facilities leased would be reduced
to twenty-two (22), representing approximately $27 million
in revenues and 898 licensed beds in central and southern
Indiana.  The reduced Indiana project is expected to close
before December 31, 1995.

Project 2:    To lease four (4) fully equipped nursing home facilities in
Missouri, Chartwell Healthcare Services of Missouri, Inc.
(CHSMI) has entered into an agreement to lease the real
property and operate four (4) nursing homes in the State of
Missouri.

Two (2) are located in St. Louis, the other two (2) are
located in Kansas City.   The buildings are in good
condition and have a history of high occupancy and
profitability.  These four (4) nursing homes have 612 beds
and revenues approaching $17 Million.

Project 3:    [USA Pharmacy of Texas] provides pharmacy prescription services
and non-legend drugs currently to ten (10) Chartwell operated
nursing homes in Texas.   Revenues for the calendar year are
approximately $2 Million dollars.  It is the desire of the company
to open USA Pharmacy of Missouri, Inc., a wholly owned
subsidiary of USA Pharmacy of Texas, Inc., in January, 1996 to
service 19 Chartwell owned nursing homes in Missouri with
similar pharmacy services.  While it will take some time to bring
all 19 facilities on line in 1996, it is anticipated the combined USA
Pharmacy revenues for calendar 1996 will be on the order of $3.5
million dollars.

In oral presentations to the Plaintiffs, Defendants Boyes, Morehead, directly and through their

selling agent, stated that there was little or no risk in the CHSMO notes because there would

always be a three-month "pipeline" of Medicaid and Medicare receivables that would be more

than sufficient to repay the balance of the notes.  Mr. Boyes failed to disclose material facts

concerning the four (4) nursing homes to be acquired in Missouri including the fact that one of

the nursing homes, Deerbrook Nursing Center, was operating under a Consent Decree with the

State of Missouri which required the licensee to employ a full-time monitor selected by the State to oversee all operations of the facility. Commencing April 15, 1996, Deerbrook was assessed civil money penalties of $3,050.00 a day and the State of Missouri threatened to terminate its Medicaid contracts. All four of the CHSMO facilities were granted only temporary licenses to operate the nursing homes pending substantial upgrades in the services provided.

133. Defendant Boyes' December 11, 1995, letter misrepresented the interest of Chartwell Healthcare Services of Missouri, Inc. in the leases and healthcare receivables of the four nursing homes in Missouri. On information and belief, Chartwell had already instructed its attorney to incorporate four (4) new entities to acquire the lease rights and property rights to the healthcare receivables of these nursing homes. Chartwell attorney, J. Marc Hesse, incorporated the new entities under the laws of the State of Missouri on December 18, 1995, and the subleases were executed on December 19, 1995, by the following Chartwell entities never mentioned in Mr. Boyes' correspondence to the Plaintiffs: Ramona Villa Nursing Center, Inc., Cedars Nursing Center, Inc., Colonial Nursing Center, Inc., and Deerbrook Nursing Center, Inc. It was these entities that acquired ownership of the nursing home receivables.

134. On January 19, 1995, Irving D. Boyes, this time as Chairman of the Board and Chief Executive Officer of Chartwell Healthcare Services of Missouri, Inc., distributed for the first time the Confidential Disclosure Statements for Chartwell Healthcare Services of Missouri, Inc. -- almost a month after his deadline for accepting the proposed transaction.

135. On January 31, 1996, Irving D. Boyes, as Chairman and Chief Executive Officer of Chartwell Healthcare of Indiana, Inc., advised the CHII Plaintiffs that a specified balance of their CHII loan was unallocated apparently because Chartwell was never able to acquire the twenty-two (22) nursing homes described in Mr. Boyes' December 11, 1995, letter as being

scheduled for closing before December 31, 1995. Instead of nursing homes in Indiana, Mr. Boyes requested permission to use the funds already entrusted to his control for "a new project of your nursing homes in Florida." Mr. Boyes did not request written authorization for the transfer of funds but instructed the CHII Plaintiffs to contact his selling agent, Kenny Kimbrough, "if you are interested in participating in the Florida project or prefer to receive a refund of the unallocated portion."

136.    Chartwell Healthcare of Florida, Inc. subsequently issued promissory notes to the following individuals (described below) which included the following unallocated advances previously made to Chartwell Healthcare of Indiana, Inc.:

| | |
|---|---|
| William Hudspeth | $ 10,049.00 |
| Mike Collier | $ 10,718.00 |
| F. E. Brown, Jr. | $ 6,699.00 |
| O. L. Kimbrough | $ 5,024.00 |
| Joel Patrick Collier, Jr. | $ 4,020.00 |
| Clark Collier Orren | $ 4,020.00 |
| Joost Gosschalk | $ 3,349.00 |
| Tom W. Landers | $ 3,349.00 |
| Hal Orgain | $ 3,349.00 |
| Pat Collier | $ 3,349.00 |
| Bobby Collier | $ 3,349.00 |
| Davenport Enterprises | $ 3,349.00 |
| Joyce A. Davenport | $ 3,349.00 |
| Curtis Collier | $ 1,341.00 |
| Michael Collier, Jr. | $ 1,341.00 |

F.    Chartwell Healthcare of Florida, Inc.

137.    In early 1996, in order to raise additional funds for the acquisition of Florida nursing homes, Chartwell's promoters issued another loan offering memorandum, requesting $2.2 million in funds to Chartwell Healthcare of Florida, Inc. Defendants Boyes and Morehead represented in the Executive Summary that, "Chartwell Healthcare of Florida, Inc. is acquiring four Florida Long Term Care Facilities including all of their assets and certain limited

liabilities," all located in Miami, Florida. Defendants Boyes and Morehead represented that these assets and the receivables generated by them would provide a "pipeline" of Medicaid and Medicare receivables that would be more than sufficient to repay the balance of the notes.

138. The loan request for $2.2 million would, according to Chartwell's promoters, "enable the Company to consummate the lease of these facilities, acquisition, transition, and rehab costs, with immediate working capital to meet payrolls prior to receipt of Medicaid and Medicare payments."

139. These statements, contained in the loan offering brochure and communicated orally to Plaintiffs were false. Chartwell's promoters, including Boyes and Morehead, knew or should have known that Chartwell Healthcare of Florida, Inc. would acquire no property rights from the money funded by the Plaintiffs and that the receivables accruing from the leasehold interest would instead be designated (by Chartwell) for receipt by other Chartwell entities. The assurance by Chartwell of a security interest in these receivables was a fraudulent misrepresentation designed to induce the Plaintiffs to advance funds to a newly formed corporation. Defendant Chartwell Healthcare of Florida, Inc. was formed under Florida law on March 11, 1996, concurrently with the formation of the following entities which were established to own and hold the nursing home leases and healthcare receivables:

Jackson Manor Healthcare, Inc.
Arch Creek Healthcare, Inc.
Snapper Creek Healthcare, Inc., and
Ponce de Leon Healthcare, Inc.

The March 18, 1996, Sublease Agreements were solely in the name of the four (4) entities identified above.

140. In the offering memorandum, Defendants Morehead and Boyes misled the Plaintiffs to believe the nursing homes were licensed, profitable, and well-managed as follows:

Jackson Manor Nursing Center, 174 beds, 89.9% occupancy,
$1,025,964 annual profit

El Ponce de Leon Nursing Center, 147 beds, 87% occupancy,
$413,326 annual profit

Snapper Creek Nursing Center, 115 beds, 89.4% occupancy,
$544,269 annual profit

Arch Creek Nursing Center, 118 beds, 87% occupancy,
$343,621 annual profit

In fact, Defendant Morehead had determined in advance of the acquisition on February 12, 1996, that three (3) of the four (4) nursing homes were not profitable and that the prior owner's financial statements were fraudulent and unreliable.

141.    At Snapper Creek Nursing Home, for example, it was reported that lack of soap in the facility for an entire week led to an outbreak in infections, and poor treatment leading to the death of a resident. The Ombudsmen Council recommended that the facility be shut down in April 1996.

142.    Chartwell's promoters again stressed that the management and the administration of the nursing homes would be centralized and controlled by Chartwell Healthcare, Inc., which "operates thirty-two facilities (3534 beds) located in Texas, Louisiana, and Missouri." Under the circumstances, Defendants Boyes and Morehead were required to disclose, but failed to disclose, Chartwell's escalating and unpaid intercompany loans, the conditional licensing of and warnings by regulators of termination of Chartwell contracts and licenses, and the losses that Morehead knew in advance would be incurred by the Florida nursing homes. These Defendants failed to disclose the critical financial status of the consolidated companies which reported a $3.5 million consolidated taxable loss for the 1995 tax year.

143.    The following individuals advanced cash in the amounts indicated below (less the credits set forth in paragraph 136, above) to purchase promissory notes made and delivered by Chartwell Healthcare of Florida, Inc. dated March 15, 1996:

| | |
|---|---|
| Bill H. Barbee | $ 50,000.00 |
| B. Hull Barbee | $ 50,000.00 |
| Helen C. Barbee | $ 50,000.00 |
| Ashley Bracken | $ 20,000.00 |
| Wendy Bracken | $ 20,000.00 |
| F. E. Brown, Jr. | $ 50,000.00 |
| Bobby Collier | $ 25,000.00 |
| Curtis Collier | $  5,000.00 |
| Joel Patrick Collier, Jr. 1993 Trust | $ 35,000.00 |
| Michael Collier, Jr. | $ 30,000.00 |
| Mike Collier | $ 25,000.00 |
| Pat S. Collier | $ 20,000.00 |
| Christi N. Davenport | $ 15,000.00 |
| Joyce Davenport, IRA | $ 77,000.00 |
| Joyce Ann Davenport | $ 10,000.00 |
| Melanie J. Davenport | $ 20,000.00 |
| Travis Davenport | $ 15,000.00 |
| Tyrone E. Davenport | $ 40,000.00 |
| Tyrone E. Davenport, IRA | $ 10,000.00 |
| Davenport Enterprises, Inc. | $ 10,000.00 |
| Billie J. Embrey | $ 50,000.00 |
| Robert D. Embrey | $ 50,000.00 |
| Jay Gordon | $ 25,000.00 |
| Joost Gosschalk | $ 28,349.00 |
| Heather K. Ruffin | $  6,250.00 |
| William H. Hudspeth | $ 25,000.00 |
| O. L. Kimbrough | $ 25,000.00 |
| Tom W. Landers | $  3,349.00 |
| Orval T. Lindsey | $ 10,000.00 |
| Sarah Elizabeth Mack | $ 50,000.00 |
| Mack Adventure Ltd. | $ 50,000.00 |
| Roger Moser, Sr. | $ 25,000.00 |
| H. A. Orgain | $ 25,000.00 |
| Rem-Tex, Inc. | $ 50,000.00 |
| Estelle Smith | $ 50,000.00 |
| Tom & Dorothy Landers<br>    Family Trust | $ 25,000.00 |

144.    According to the promissory notes, the purpose of the notes was to provide for debt financing for the subleasing and operation of four (4) nursing home facilities located in Florida (the "Facilities").   On information and belief, the promissory notes were drafted, reviewed, and approved by Defendants Irving D. Boyes and J. Marc Hesse for dissemination to the Plaintiffs.

145.    The notes falsely stated that "Maker shall enter into long term subleases for the occupancy and operation of the Facilities with a scheduled effective date of March 31, 1996 (the 'Closing')."

146.    Unlike prior notes, the Chartwell Healthcare of Florida, Inc. notes contained no participation rights based on gross proceeds received by the nursing homes.   According to the statements of Defendants in the promissory notes, the notes were secured by "an assignment of the receivables of the Facilities up to the amount equal to the Note."   This representation, as stated above, was false.   In fact, on November 4, 1996, Defendant Boyes conveyed a security interest in these same receivables as collateral for a line of credit at Texas Community Bank.

147.    Subsequent to Chartwell's acquisition of the four (4) nursing homes, the Florida regulators repeatedly sanctioned the nursing homes and the Chartwell administrators for deficient care to residents.   Defendants Boyes and Lively were grossly negligent in overseeing the operations at these facilities and this negligence directly led to the loss of licenses, leases, and receivables securing Plaintiffs' notes.

148.    Life safety and other nursing care deficiencies in 1997 and 1998 at Jackson Manor resulted in the death of two (2) patients at Jackson Manor in 1998.   The state of Florida appointed a temporary receiver for the facility and requested Chartwell's subsidiary to surrender its license.

149.    A chronic cyclical pattern between 1996 and 1998 of substandard care and non-compliance with professional standards of nursing care, including inadequate infection control, incomplete and inadequate preparation and maintenance of medical care reports, inadequate staffing and unsanitary conditions involving serious jeopardy to the health, safety and welfare of patients, resulted in the termination of Medicare and Medicaid agreements with Chartwell's subsidiary at Ponce de Leon and appointment of a temporary receiver and surrender of licenses.

150.    Defendants Boyes and Lively's failure to provide proper infection control and adequate nutrition, failure to prevent unsanitary conditions and life safety deficiencies; failure to maintain clinical records and develop comprehensive care plans for patients at Snapper Creek resulted in regulators barring admission on three (3) separate occasions before the facility was closed in late 1996.

151.    Life safety and other deficiencies at Arch Creek Nursing Home resulted in the appointment of a temporary receiver and the surrender of the nursing home license.

G.    USA Pharmacy, Inc./USA Pharmacy of Florida, Inc.

152.    In early 1996, the following Plaintiffs invested the amounts specified below for purchase of promissory notes issued by USA Pharmacy, Inc., a Texas corporation:

| | |
|---|---|
| Bill H. Barbee | $10,189.00 |
| B. Hull Barbee | $10,189.00 |
| Helen C. Barbee | $ 5,094.00 |
| F.E. Brown, Jr. | $10,189.00 |
| Joel Patrick Collier | $ 6,114.50 |
| Tyrone E. Davenport | $10,189.00 |
| Davenport Enterprises | $ 5,094.00 |
| Heather K. Davenport | $ 5,094.00 |
| Joyce Ann Davenport | $ 5,094.00 |
| Dr. Jay T. Gordon | $ 5,094.00 |
| Dr. Edward Mack | $10,189.00 |
| Clark Collier Orren | $ 6,112.50 |

(hereinafter "USA Plaintiffs").

153.    The promissory notes were dated on or about January 1, 1996, and stated that each note was secured by an assignment of the receivables of the maker "up to the amount equal to the amount of the note."  The notes were executed and delivered to the USA Plaintiffs by Defendant Irving D. Boyes, as Chairman of the Board and Chief Executive Officer of U.S.A. Pharmacy, Inc.

154.    On July 8, 1996, Defendant Boyes sold all of the assets of USA Pharmacy, including the accounts receivables securing Plaintiffs' notes to Pharmacy Corporation of America.  Instead of using the sales proceeds to discharge Plaintiffs' indebtedness, defendant Boyes proposed on August 9, 1996, that the USA Plaintiffs maintain their loans at USA Pharmacy or transfer the principal balance of the loan to USA Pharmacy of florida, Inc. which was "incorporated to provide pharmacy services to four (4) nursing home facilities operated by Chartwell Healthcare, Inc. in Florida."  According to defendant Boyes, USA Pharmacy, Inc. would build back the volume of business and revenues it previously had.

155.    These representations by Defendant Boyes to Plaintiffs were false.  Defendant Boyes knew or should have known that he agreed with Pharmacy Corporation of American (PCA) from competing with PCA in any of the thirty-two (32) facilities Chartwell operated for a ten year period.  Neither USA Pharmacy, Inc., a Texas corporation, nor USA Pharmacy of Florida, Inc. produced any income after the sale to PCA.

156.    The USA Plaintiffs relied on Defendant Boyes fraudulent misrepresentations to their detriment.  USA Pharmacy, Inc. and USA Pharmacy of Florida, Inc. defaulted on the monthly installments of principal and interest due July 1998 and thereafter.

H.    Chartwell Healthcare-Midwest, Inc./Chartwell Home Healthcare, Inc.

157.    In December 1996, Chartwell's promoters solicited $2.5 million in so-called "purchase money loans" in connection with the acquisition of 25 nursing homes located in Kansas, Missouri, Arkansas and Oklahoma.  This offering, as well as the subsequent Chartwell Home Healthcare offering, was made to persons who were neither sophisticated nor well-informed on matters related to the operation of nursing homes or home health industry and had no relationship to Defendants.  Defendants made no effort to restrict or control the dissemination of the offering memoranda they utilized in connection with the solicitation.

158.    Defendants Boyes and Morehead represented in the Executive Summary for the Chartwell Healthcare-Midwest Offering that $6-8 million in annual profits would accrue to Chartwell Healthcare-Midwest, Inc. from the acquisition over the next five (5) years.

159.    The Chartwell Healthcare-Midwest promissory notes specifically stated that "Maker [Chartwell Healthcare-Midwest] shall enter into long-term lease[s] for the occupancy and operation of the Facilities with a scheduled effective date of January 15, 1997 (the "Closing")," and assured the Plaintiffs that the notes were backed by the nursing home receivables.  On information and belief, the promissory notes were drafted, reviewed and approved by Defendants Irving D. Boyes and J. Marc Hesse for dissemination to the Plaintiffs.

160.    The following persons invested cash sums as specified below for the purchase of Chartwell Healthcare - Midwest and/or Chartwell Home Healthcare, Inc. promissory notes:

| Bill H. Barbee | $ 25,000.00 |
| B. Hull Barbee | $ 25,000.00 |
| Helen C. Barbee | $ 50,000.00 |
| Ashley Bracken | $ 10,000.00 |
| Wendy Bracken | $ 10,000.00 |
| F. E. Brown, Jr. | $ 50,000.00 |
| Bobby Collier | $ 25,000.00 |
| Joel Patrick Collier, Jr. | $ 25,000.00 |
| Mike Collier | $ 25,000.00 |
| Pat S. Collier | $ 25,000.00 |

| | |
|---|---|
| Brian H. Davenport | $  5,000.00 |
| Christie Davenport | $  8,500.00 |
| Joyce Ann Davenport | $ 10,000.00 |
| Melanie Davenport | $ 12,900.00 |
| Travis Davenport | $  3,100.00 |
| Tyrone E. Davenport | $ 80,000.00 |
| Tyrone E. Davenport, IRA | $ 10,000.00 |
| Jay T. Gordon | $ 25,000.00 |
| Hoyl Oil & Mineral, Inc. | $ 20,000.00 |
| William H. Hudspeth | $ 25,000.00 |
| William H. Hudspeth | $ 30,000.00 |
| O. L. Kimbrough | $ 25,000.00 |
| Tom and Dorothy Landers Family Trust | $ 25,000.00 |
| Tom W. Landers, Sr. | $ 25,000.00 |
| Tom W. Landers III and Joan Landers | $ 10,000.00 |
| Jerry Landers | $ 10,000.00 |
| Orval T. Lindsey | $ 16,400.00 |
| Orval T. Lindsey - IRA | $  8,600.00 |
| William B. Lindsey - IRA | $ 50,000.00 |
| Dr. Edward Mack | $ 50,000.00 |
| W. M. Matthews | $ 50,000.00 |
| Roger Moser, Sr. | $ 10,000.00 |
| Clark Collier Orren | $ 25,000.00 |
| Shiloh Christian Fellowship | $ 25,000.00 |

161.    After accepting Plaintiffs' funds based on the representations and terms stated above, Chartwell's promoters  notified the investors by letter dated May 15, 1997, that the closing of the Midwest purchase transaction had been postponed many times and "it is possible that a Closing will never take place."

162.    In his May 15, 1997, letter, Irving D. Boyes (this time as Chairman of the Board and Chief Executive Officer of Chartwell Healthcare - Midwest, Inc.) stated that because of the uncertainty of the Midwest transaction, "Chartwell proposes its lenders participate in another project that has been in negotiation to acquire a 70% majority stock interest in Valley Health Group, Inc., Phoenix, Arizona."

163.    Mr. Boyes proposed that the Plaintiffs exchange notes in Chartwell Home Healthcare, Inc., which, he said, had entered into an agreement to acquire the controlling stock

of Valley Health Group, Inc.  According to Ms. Boyes, "Chartwell Home Healthcare, Inc. currently owns four home health companies in Texas, Missouri, and Minnesota."

164.  Pursuant to the May 15, 1997, letter, the Plaintiffs were given only one week, until May 21, 1997, to agree to the exchange.  On information and belief, Mr. Boyes had already used the proceeds of the Midwest loans, and the Plaintiffs' position had no effect on his use of the funds.

165.  On or about June 1, 1997, Chartwell Home Healthcare, Inc. made and delivered promissory notes payable over a ten-year term to the Plaintiffs identified in paragraph 160, above.  On information and belief, the promissory notes were drafted reviewed, and approved by Defendants Irving D. Boyes and J. Marc Hesse, for dissemination to the Plaintiffs.

166.  The promissory notes made and delivered by Chartwell Home Healthcare, Inc. falsely stated that the notes are "additionally secured by an assignment of the receivables of the Facilities up to the amount equal to the Note."  The word "Facilities" was defined as "Valley Health Group, Inc., a Delaware corporation, operating in the states of California, Arizona, Nevada, and Colorado."  Defendants Boyes and Morehead knew or should have known that Valley had not and would not convey the security interest committed by Mr. Boyes in his communication with the Plaintiffs.

167.  Defendants Boyes and Morehead, directly and through their selling agent, failed to disclose the following material facts about the proposed investment which were necessary to make their other statements to the Plaintiffs not misleading:

(a)  Chartwell Home Healthcare, Inc. paid a total purchase price of $6,930,000 for the stock of Valley Health Group, Inc., which included the issuance of promissory notes to the sellers in the amount of $4.8 million with a priority lien on the Valley assets;

(b)     Valley's ability to continue operating would be compromised if its accounts receivable lender, Norwest Bank, failed to renew its line of credit (which subsequently occurred);

(c)     At the time Chartwell Home Healthcare acquired Valley, Valley was required to pay Medicare over $7 million in overpayments previously made to Valley; and

(d)     Defendants intended to pledge Valley's accounts receivable to subsequent lenders and thereby dilute any security interest offered as an inducement to Plaintiffs to invest.

I.      Chartwell Healthcare Services of Florida, Inc.

168.    In the summer of 1997, in anticipation of an August 1, 1997, Sublease with Beverly Enterprises, Chartwell's promoters, including Defendants Boyes and Morehead commenced a new loan offering in the name of Chartwell Healthcare Services of Florida, Inc., a corporation formed by Chartwell's attorney, Defendant J. Marc Hesse, on June 25, 1997. This offering was made to persons who were neither sophisticated nor well-informed on matters related to the operation of nursing homes, and had no relationship to Defendants. Defendants made no effort to restrict or control the dissemination of the offering memoranda they utilized in connection with the solicitation.

169.    The loan offering memorandum blatantly misrepresented that "Chartwell Healthcare Services of Florida, Inc. is acquiring four Florida Long Term Care Facilities including all of their assets and certain limited liabilities." The Facilities were described by location and number of beds as follows:

| | Location | Number of Beds |
|---|---|---|
| 1. | Pensacola Health Care<br>Pensacola, Florida | 118 |
| 2. | Manhattan Convalescent Center<br>Tampa, Florida | 179 |

| 3. | Holly Point Manor<br>Orange Park, Florida | 120 |
| 4. | Jupiter Care Center<br>Jupiter, Florida | 120 |

170.    According to Chartwell's promoters, including Defendants Boyes and Morehead, the nursing homes were highly profitable and had a history of significant cash flow from operations. Again, they represented that the notes would be secured by a "pipeline" of nursing home receivables that would provide more than adequate security to repay the principal balance of the notes. Chartwell's promoters represented that Chartwell's operations in 1997 were highly profitable and that Chartwell was poised to "go public." They failed to disclose that Chartwell had a 1997 taxable loss of over $10 million.

171.    Regardless of the condition of the homes funded in prior offerings, the individuals solicited to invest in Chartwell Healthcare Services of Florida, Inc. ("CHSFL") were assured that the revenues of the four nursing homes securing this debt would be used solely for CHSFL-related debt, and would not be commingled with other, less-profitable nursing home operations. Defendants knew or should have known that these representations to Plaintiffs were false inasmuch as Chartwell had a long history of commingling the revenues of all nursing homes under its control.

172.    Based upon the above and other representations, the following persons purchased CHSFL promissory notes in the amounts stated below:

| | |
|---|---|
| Michael Lee Andrews Trust | $ 25,000.00 |
| Asbury Family Trust | $ 25,000.00 |
| Bill and Betty Barbee Trust | $ 50,000.00 |
| Helen C. Barbee | $ 50,000.00 |
| Bobby Collier | $ 25,000.00 |
| Joel Patrick Collier | $ 35,000.00 |
| Mike Collier | $ 50,000.00 |
| Pat S. Collier | $ 20,000.00 |

| Clifford E. Cumbie | $ 10,000.00 |
| Jonas A. Gosschalk | $ 25,000.00 |
| Joost Gosschalk | $ 25,000.00 |
| Carroll V. Guice | $ 20,000.00 |
| William H. Hudspeth | $ 25,000.00 |
| O. L. Kimbrough | $ 15,000.00 |
| Jerry Landers | $ 10,000.00 |
| Michael C. Landers | $ 15,000.00 |
| Tom and Dorothy Landers Trust | $ 30,000.00 |
| Tom and Dorothy Landers | $ 25,000.00 |
| Tom W. Landers III and Joan Landers | $ 15,000.00 |
| Michael E. Sanders | $ 25,000.00 |
| Bernard Taylor | $ 50,000.00 |

These individuals are collectively referred to herein as the CHSFL Plaintiffs.

173. On information and belief, the promissory notes were drafted, reviewed and approved by Defendants Irving D. Boyes and J. Marc Hesse for dissemination to the Plaintiffs. Each of the notes stated that "the purpose of the Note is to provide for debt financing for the leasing of four (4) nursing home facilities located in the State of Florida ("the 'Facilities')."

174. The notes specifically misrepresented that "Maker shall enter into [a] long term lease for the occupancy and operation of the Facilities with a scheduled effective date of August 1, 1997 (the 'Closing')."

175. Chartwell's promoters, including Irving D. Boyes and Steve Morehead, knew or should have known that the corporate maker of the notes had not and would not enter into a long term lease for the facilities -- that the maker was simply a shell corporation formed for the purpose of fraudulently inducing the CHSFL Plaintiffs to invest in non-recourse notes. On June 15, 1997, before the CHSFL Plaintiffs purchased the notes, Chartwell's attorney confirmed that the nursing homes would be acquired by the following newly formed corporations:

Pensacola Healthcare, Inc.
Manhattan Healthcare, Inc.
Holly Point Healthcare, Inc.
Jupiter Healthcare, Inc.

179.    In April 1998, unable to obtain the $3 million requested, Defendants Boyes and Morehead began "discounting" the PMA notes to obtain funds. Thus, in mid April 1998, Gary Embrey advanced $145,026.87, for a PMA note in the face amount of $175,000.00.

180.    Defendants Boyes and Morehead and their selling agent, Kenneth B. Kimbrough, represented to Plaintiffs that the PMA notes were "just like" the other notes made by the Chartwell entities described above. In fact, the promissory notes delivered after the Plaintiffs advanced the purchase price did not contain any provision for security or other collateral in the event that PMA defaulted on the notes.    On information and belief, Defendants Boyes and Morehead are currently in the process of transferring valuable contracts and other assets to yet another corporation they formed in 1999, USA Personnel, Inc.

K.    1998 Transactions with HCFP Funding, Inc. and 22 Acquisition Corporation

181.    After Chartwell incurred a consolidated $10 million taxable loss for the 1997 calendar year, Defendants knew or should have known that the Chartwell companies were in danger and that all available resources should be concentrated on operation of the nursing homes - the source of virtually all of Chartwell's revenue.

182.    During this time period, the state healthcare agencies were assessing substantial civil money penalties and taking aggressive disciplinary action against Chartwell's nursing home operations. At East Hill Nursing Center in Missouri, a state monitor was appointed to oversee Chartwell's operations and the state threatened to close the facility. Almost half of Chartwell's nursing homes were facing some type of disciplinary action from the state and federal government, ranging from conditional license renewal to termination of Medicare and Medicaid agreements.

183.   At a private management meeting on April 16, 1998, Boyes stated that ten (10) different persons and entities could put Chartwell out of business, including the Plaintiffs, the landlords who leased the nursing homes to Chartwell, and four (4) major suppliers.

184.   Instead of disclosing Chartwell's precarious financial condition to the Plaintiffs or otherwise seeking bankruptcy protection for Chartwell's nursing home operations, Defendants Boyes and Morehead continued to represent that the company was poised to "go public" and that several companies had expressed an interest in buying Chartwell's nursing home operations, including the obligations to Plaintiffs under the notes, for $25 million.

185.   On information and belief, Defendants Boyes and Morehead made these misrepresentations because they knew if they disclosed the truth about Chartwell's operations, the Plaintiffs would enforce their security agreements and the Defendants would not be able to sell the additional $3 million in notes issued by Parkway Medical Associates, Inc.

186.   On information and belief, these Defendants devised a scheme to convert to cash the remaining nursing home assets (previously pledged as security for Plaintiffs' loans).  They then diverted the cash proceeds to the start-up home health and staffing agencies they formed in 1998, and arranged for Chartwell Healthcare, Inc. to buy back a portion of their shares of stock for a hefty profit.

187.   In February 1998, Defendants Boyes and Morehead negotiated an accounts receivable credit facility with a secondary lender, HCFP Funding, Inc., which was secured by the same accounts receivable previously conveyed as security to Plaintiffs.  The credit facility refinanced $2.2 million in letters of credit which the Chartwell nursing homes posted under the terms of their leases.  Because the previous letters of credit at Texas Commerce Bank and Compass Bank were secured by cash funds on deposit at these banks, the new HCFP facility

effected a release of the cash collateral and a substitution of Plaintiffs' security interests as collateral for the subsequent lender, HCFP. Defendants Boyes, Salkeld, and Morehead, however, failed to disclose or obtain prior approval from Plaintiffs for this substitution of collateral.

188.    Instead of using the cash to pay off part of the indebtedness owed to the Plaintiffs, Defendants Boyes, Salkeld, and Morehead used the cash to benefit themselves and their outside business interests. Thus, on February 27, 1998, Defendant Boyes issued and executed the following checks were drawn on funds previously securing the nursing home letters of credit:

| | |
|---|---|
| Irving D. Boyes and Shirley Salkeld | $250,000 |
| Steve Morehead | $100,000 |
| Serendipity Trust (Kenneth Kimbrough) | $100,000 |

189.    Previously, Defendants Boyes, Morehead, and Hesse filed a UCC-1 financing statement with the Texas Secretary of State acknowledging the Plaintiffs security interest in the same collateral securing HCFP's credit facility. Defendants filed the UCC-1 at the request of Kenneth B. Kimbrough, who had assured the Plaintiffs that they had valid and enforceable security interests in Chartwell's nursing homes. After repeatedly committing to the Plaintiffs that the security interests would be perfected, Defendant Morehead falsely represented to Kenneth Kimbrough that it was not legally possible to file UCC-1's on behalf of each of the Plaintiffs because there were so many of them.

190.    Instead, Defendant Morehead falsely represented that a single UCC-1 filed in the name of Kenneth B. Kimbrough, as Trustee for the Plaintiffs, would properly perfect the security interests held by Plaintiffs. Thus, pursuant to Defendant Morehead's instructions, a UCC-1 was filed with the Texas Secretary of State on September 22, 1995, acknowledging that "75% of the monthly receivables received by Debtor from the operation of its nursing home

facilities" was conveyed as security to "Kenneth B. Kimbrough, Trustee on behalf of all ETHC lenders." There was no trust agreement between Kenneth B. Kimbrough and the Plaintiffs, and the UCC-1 and its subsequent release constituted a device to manipulate and deceive the Plaintiffs.

191.    After discovering the UCC-1 in 1998, HCFP demanded that Defendants Boyes and Morehead secure a termination of the financing statement. Knowing that Kimbrough had no authority to terminate the Plaintiffs' security interests, Defendants Boyes and Morehead nonetheless arranged for Kimbrough to execute a UCC-3, purporting to terminate the Plaintiffs' security interests. Defendant Hesse, in turn, provided the executed UCC-3 to HCFP even though he knew or should have known that the termination statement was unauthorized and fraudulently obtained. Shortly thereafter, Kenneth B. Kimbrough received $100,000.00 for redemption of his stock in Chartwell Healthcare, Inc. He did not, however, convey any stock.

192.    Over the next few months, HCFP became increasingly aware of fraudulent financial data generated by Defendants. Because HCFP had overextended credit to Chartwell's affiliate, Valley Health Group, Inc. in Arizona, however, it did not want to force a liquidation until Chartwell arranged for another lender to refinance HCFP's line to Valley.

193.    On information and belief, Defendant Morehead knew that once the Valley line was paid off, HCFP would foreclose its security interest on Chartwell's nursing homes. At this point, on information and belief, Defendants Boyes, Salkeld, and Morehead accelerated the diversion of nursing home funds to persons and entities outside HCFP's control. Throughout this period, Morehead publicly proclaimed that Chartwell was "for sale," and that several purchasers were willing to pay $25 million for the business. He even offered tax advice to

Kenneth Kimbrough in July 1998 on how to shelter the significant income Kimbrough would receive on the sale of his stock.

194.    In order to maximize the sales value of Chartwell's nursing home operations as a going concern, it was critical that Defendants properly operate the nursing homes and utilize the revenue stream for payroll and administration of the nursing homes. Instead, Defendants continued to skim revenues for their personal and outside business interests, and operations at the nursing homes continued to decline.

195.    The Miami Herald reported on July 10, 1998, that Chartwell's failure to provide air conditioning at a Miami nursing home led to ninety degree temperatures at the facility and the death of an elderly patient. Another Chartwell home, Arch Creek, was temporarily banned from admitting new patients based on severe fire-safety violations. Snapper Creek was shut down by regulators for poor treatment of patients, including severe malnutrition and starvation. The State of Florida terminated Medicaid and Medicare contracts at El Ponce de Leon Convalescent Center in Miami for repeated violations in patient care.

196.    The poor operation of the above-referenced Miami homes led the Miami Herald to mock Chartwell by claiming that a prison inmate would be better off than the elderly patients at Chartwell nursing homes.

197.    Unwilling to commit the resources necessary to properly operate the facilities, Defendants simply abandoned their duties to patients, employees, and the Plaintiffs.

198.    Based on statements by Chartwell employees to the public that Chartwell would not meet its payroll obligations due July 31, 1998, the States of Florida, Missouri, and Texas commenced proceedings for the appointment of receivers to operate Chartwell's nursing homes. Hoping that Chartwell's licenses and leases could be obtained for nothing, the President of one

of the companies previously approached by Morehead, Peter Licari of Complete Care Services, Inc. ("CCS"), called Morehead on July 31, 1998, and said that CCS was interested in buying Chartwell -- for $4 million, not $25 million.

199.    Defendants Irving D. Boyes, Morehead, and Gregory Boyes and Peter Licari at CCS, knew that Chartwell had not funded its payroll obligations for the July 31 payroll. At the time the weekend negotiations were conducted, therefore, the most significant term of the parties' agreement was CCS' willingness to fund the payroll.

200.    Having made no alternative arrangements for the funding of the nursing home payroll, Defendants essentially allowed CCS and its shell corporation, 22 Acquisition Corporation, to acquire Chartwell's leases, licenses, and accounts receivable for the price of a payroll. When CCS reneged on its commitment to fund the Missouri payroll, Defendants Boyes, Salkeld, Morehead, and Iglehart made no effort to obtain alternative financing for the Missouri payroll even though Defendant Morehead had demonstrated the ability to procure a $6 million line of credit to discharge HCFP's loan to Valley Health Group, Inc. on July 22, 1998.

201.    Defendants grossly neglected their duties to Plaintiffs and others and just "walked away" to pursue other ventures.

202.    When trustees and investigators sought Defendants' records to piece together what had happened, Defendants destroyed and permanently removed records that would reveal their blatant wrongdoing.

**IV.**

## LIMITATIONS

203.   All causes of action set forth herein are timely made.  The statute of limitations for Texas common-law actions, including fraud, negligent misrepresentation, breach of fiduciary duties and participation in breach of fiduciary duties, fraudulent transfer, accounting, constructive trust, and negligence were tolled during the time that Defendants fraudulently concealed facts forming the basis of this action and during the time that Defendants maintained fiduciary relationships with the Plaintiffs.  The statutory causes of action did not accrue until Plaintiffs had notice of facts sufficient to base their respective claims.

### V.

## SUBSTANTIVE COUNTS

A.     Count One:   Civil Conspiracy

204.   Plaintiffs incorporate herein by reference paragraphs 1 - 203 above.

205.   Defendants Irving D. Boyes and Stephen K. Morehead combined, conspired, and agreed to solicit funds from Plaintiffs based on fraudulent representations and in violation of the securities laws.  Defendants Salkeld, Iglehart, and Hesse had knowledge of the unlawful means and objectives employed by Defendants Boyes, Salkeld, and Morehead and knowingly participated in Defendants' unlawful agreement and course of conduct.  Each of these Defendants committed one or more overt acts in furtherance of the unlawful objective and course of conduct, including preparation of illegal and fraudulent offering memoranda, promissory notes, and other communications to the Plaintiffs; commingling of funds and improper transfers of funds and preparation of fraudulent financial statements.

206. Defendants Irving D. Boyes, Shirley A. Salkeld, Donald R. Iglehart, Stephen K. Morehead, and Gregory N. Boyes combined, conspired, and devised a scheme to divert and misapply assets intended as security for Plaintiff's notes.

207. Defendants' wrongdoing proximately caused Plaintiffs to lose the amounts they invested in the Chartwell corporations and the interest they reasonably expected to earn on such funds.

208. Plaintiffs are entitled to compensatory, exemplary, and punitive damages against Defendants.

B.  Count Two:  Breach of Fiduciary Duty and Other Duties/
                Participation in Breach of Fiduciary Duty

209. Plaintiffs incorporate herein by reference paragraphs 1 - 208 above.

210. Defendants, and each of them by reason of their positions at and/or responsibilities to Chartwell Healthcare, Inc., the insolvent condition of Chartwell Healthcare, Inc. and its subsidiaries, and as a result of Plaintiffs' dependence on Defendants to control the business and corporate affairs of the Chartwell entities that were formed pursuant to Plaintiffs' investments, owed the Plaintiffs the fiduciary duties of fidelity, trust, loyalty, honesty and due care and were required to deal with and carry out their duties and responsibilities in a fair, just and equitable manner and in the best interest of the Plaintiffs so as to benefit Plaintiffs, and not further their personal interests at the expense of or in derogation of the best interests of the Plaintiffs.

211. The Defendants, singly and in concert, engaged in the aforesaid conduct in breach of their fiduciary duties to the Plaintiffs.

212. Defendants Irving D. Boyes and Stephen K. Morehead owed fiduciary duties of loyalty, full disclosure, strict integrity, and fair and honest dealing to Plaintiffs based upon the special trust and confidence reposed in them by the Plaintiffs; the acceptance of Plaintiffs' funds

214.    Defendants Salkeld, Lively, Iglehart, and Gregory Boyes participated in Defendants' breach of fiduciary duty and otherwise violated their duty to exercise reasonable care under the circumstances by effecting and reporting transactions in Plaintiffs' accounts which they knew or should have known would mislead the Plaintiffs; by engaging in the transfer of funds which they knew or should have known was unauthorized and constituted a conversion of Plaintiffs' security interests; by permitting other officers to transfer funds without an accounting or proper explanation for the transfer; by failing to report or disclose significant regulatory actions initiated against the debtor corporations; and by failing to properly employ or supervise the agents employed to solicit funds on behalf of the debtor corporations.

215.    Defendants' breach of duty and/or participation in breach of fiduciary duty proximately caused the Plaintiffs to lose the amounts they invested in the debtor corporations, and the interest they reasonably expected to earn on such funds.  Plaintiffs are entitled to recover these damages and exemplary and punitive damages for the wrongful conduct committed by Defendants.

C.    Count Three:  Continuing Fraud

216.    Plaintiffs incorporate herein by reference paragraphs 1 - 215 above.

217.    For the purpose of inducing investors, including Plaintiffs and others to purchase the notes, and with the intent to deceive such investors, the Defendants Boyes and Morehead employed a scheme to defraud as a part of which the Defendants made and participated in the making of material misrepresentations of fact and the fraudulent omission to state material facts.

218.    Between 1993 and 1998 and continuing throughout that period, Defendants Irving D. Boyes and Stephen K. Morehead, directly and through their selling agent, Kenneth B. Kimbrough, made false statements in written and other communications to Plaintiffs, including

but not limited to the following: Chartwell was a highly successful and profitable business; that Chartwell was poised to "go public" by the year 2000; that the promissory notes they sold to Plaintiffs were secured by healthcare receivables insured by U.S. and state governments; that Defendants had specialized knowledge, skill, and expertise in the healthcare industry; and that Defendants' operations and management had been endorsed and approved by independent third parties including independent accountants. These representations, misleading half-truths and omissions were false.

219. Plaintiffs were ignorant of the material misrepresentations and omissions described herein. In justifiable reliance on the misrepresentations and in ignorance of the true facts, Plaintiffs and others were induced to and did purchase the notes. Had Plaintiffs and others known the true facts, they would not have purchased the notes. By reason thereof, Plaintiffs have been damaged and demand compensation, exemplary and punitive damages against Defendants.

D.    Count Four:   Violation of the Texas Securities Act, Article 581-33 (Controlling Person Liability for Registration Violations)

220. Plaintiffs incorporate herein by reference paragraphs 1 - 219 above.

221. Defendants Boyes and Morehead, and their selling agent, Kenneth B. Kimbrough, were sellers and offerors of promissory notes in Chartwell Healthcare-Midwest, Inc., Chartwell Home Healthcare, Inc., Chartwell Healthcare Services of Florida, Inc., and Parkway Medical Associates, Inc. within the meaning of sections 7 and 12 of the Texas Securities Act, Tex. Rev. Civ. Stats, Art. 581-7 and 581-12 (Vernon Supp. 1999). The promissory notes constitute "securities" under the definition set forth at Tex. Rev. Civ. Stats, Art. 581-4(A), and neither the offering or the securities were exempt from registration under the terms of the Texas Securities Act.

222. Defendants and their selling agent, Kenneth B. Kimbrough, sold and offered to sell promissory notes, which constitute securities, when no registration statement was filed or was in effect and when no exemption from registration was available in violation of Tex. Rev. Civ. Stats. Art. 581-7.

223. Defendants were not registered with the State Securities Board or the Securities Exchange Commission at the time the promissory notes were sold and offered for sale.

224. Defendants Irving D. Boyes, Shirley Salkeld, Michael J. Lively, and Stephen K. Morehead directly and indirectly controlled the issuer of the securities, i.e., Chartwell Healthcare-Midwest, Inc., Chartwell Home Healthcare, Inc., Chartwell Healthcare Services of Florida, Inc., and Parkway Medical Associates, Inc., at the time the securities were sold because each such defendant possessed, directly or indirectly, the power to influence and exercised the same to direct the actions conducted by or attributable to the issuers of the securities.

225. Defendant Morehead materially aided the seller and issuer in the sale and offer of unregistered securities with reckless disregard for the truth and the law.

226. Plaintiffs purchased the notes of Chartwell Healthcare-Midwest, Inc., Chartwell Home Healthcare, Inc., Chartwell Healthcare Services of Florida, Inc., and Parkway Medical Associates, Inc. Accordingly, Plaintiffs are entitled to and seek recovery of the full amount of consideration paid for said securities, with interest thereon, upon tender of such securities, which tenders are hereby made.

E.   Count Five:   Violation of Section 12(2) of The Securities Act of 1933 and Article 581-33 (A) (2) of the Texas Securities Act.

227. Plaintiffs incorporate herein by reference paragraphs 1 - 226 above.

228. The promissory notes forming the subject of this action constitute "securities" under 15 U.S.C. §77b(1) and Tex. Rev. Civ. Stats, Art. 581-4(A). Defendants Boyes and

Morehead directly and through their selling agent, Kenneth B. Kimbrough, participated in a continuous course of conduct by the use of the mails, wires, and other means and instrumentalities of communication and transportation and interstate commerce, and offered for sale, sold and were the proximate cause and substantial and necessary factors in the sale of the notes to the Plaintiffs, by means of written promotional materials, oral communications, and other representations in violation of section 12(2) of the Securities Act of 1933 and the Texas Securities Act, Tex. Rev. Civ. Stats., Art. 581-33 (A)(2).

229. Defendant Hesse co-authored the promissory notes, which contained fraudulent assurances of security. Defendant Hesse knew or should have known, by virtue of his formation of separate corporations which would own and hold the nursing home receivables and other facts known to him, that the notes were being used to fraudulently obtain money from the Plaintiffs. Under the circumstances, Defendant Hesse was also a seller of the notes to Plaintiffs, or, in the alternative, an aider and abettor in the Texas Securities Act violations described herein.

230. The offering memoranda, the oral representations and the notes and contracts that were submitted in connection with the offering contained untrue statements of material facts, and omitted to state material facts necessary to make the statements made not misleading, in light of the circumstances under which they were made, as set forth above.

231. Plaintiffs and others purchased the notes.

232. Plaintiffs are entitled and seek to recover the full amount of the consideration paid for the notes, together with interest thereon upon tender of such securities, which tender is hereby made, or in the alternative, seek damages sustained as a result of the sale of such securities.

233.    Defendants Boyes, Salkeld, Lively, and Morehead are liable to Plaintiffs as controlling persons under section 15 of the Securities Act, 15 U.S.C. §77o, and the Texas Securities Act, Art. 581-33 (F)(1), for all the unlawful acts set forth herein which constitute violations of section 12(2) of the Securities Act of 1933 and article 581-33 (A)(2) of the Texas Securities Act because each such Defendant possessed, directly or indirectly, the power to influence and exercised the same, to direct the activities conducted by or attributable to the entities that issued the securities forming the subject of this claim.

234.    This count is filed on behalf of Plaintiffs who purchased notes on or after June 1, 1994, in the following entities:    Chartwell Healthcare of Wisconsin, Inc., Chartwell Healthcare of Missouri, Inc., Chartwell Healthcare of Missouri II, Inc., C.M., Inc., Chartwell Healthcare of Oklahoma, Inc., Chartwell Healthcare of Indiana, Inc., Chartwell Healthcare Services of Missouri, Inc., USA Pharmacy of Florida, Inc., Chartwell Healthcare of Florida, Inc., Chartwell Healthcare-Midwest, Inc., Chartwell Home Healthcare, Inc., and Chartwell Services of Florida, Inc.

235.    At the time of their purchases, Plaintiffs were without knowledge of the facts concerning the wrongful conduct alleged herein and, due to Defendants' concealment of those facts, were not given reason to suspect wrongdoing and inquire into those facts.    Thus, the claims in this count have been asserted within the time provided by the statute of limitations.

F.    Count Six:    Violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 Promulgated Thereunder

236.    Plaintiffs incorporate by reference paragraphs 1 - 235 as if fully set forth herein.

237.    Commencing prior to the issuance of the subject notes and continuing until the end of 1998, Defendants and each of them participated in the conception and/or implementation of a fraudulent scheme to raise funds for insolvent firms through the issuance, marketing, and sale

of notes in USA Pharmacy of Florida, Inc., Chartwell Healthcare-Midwest, Inc., Chartwell Home Healthcare, Inc., and Chartwell Healthcare Services of Florida, Inc. and to fraudulently convey the assets acquired with the proceeds of the note offerings. The promissory notes constitute "securities" under 15 U.S.C. §78c(10). As set forth in paragraphs 153 - 202 above, each of the Defendants engaged in acts, practices and a common course of business which operated as a fraud of deceit upon Plaintiffs.

238.    At all relevant times, the true nature of the notes and the risks associated with an investment in the notes were fraudulently concealed from and/or misrepresented to Plaintiffs by Defendants, each of whom participated in, controlled, approved and/or acquiesced in the fraudulent acts, practices and courses of conduct complained of herein.

239.    Among the deceptive, manipulative, and fraudulent acts, practices and courses of conduct committed by Defendants were (1) the failure to disclose the true structure, operations and financial condition of Chartwell Healthcare, Inc. and its subsidiaries; (2) the solicitation of purchase money loans purportedly secured by healthcare receivables and the assurance that such security interests had been perfected, and thereafter, the unauthorized and global termination of a financial statement filed on behalf of Plaintiffs; (3) the failure to disclose the series of life safety violations and disciplinary proceedings lodged by state and federal regulators against Chartwell nursing homes; (4) the compilation, drafting, and dissemination of financial statements and other documents which overstated revenues, receivables, profitability, equity, and cash; (5) the formation and public funding of multiple corporations with incomplete and misleading disclosures concerning the assets held by each; (6) the fraudulent transfer of assets and income-producing contracts without disclosure to noteholders holding a security interest in such assets and contracts; (7) the commingling of assets and intercompany loans designed to conceal the